UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                                       :
TIMOTHY ANDREW MCCAFFREY,                              :
                                                       :
                                      Plaintiff,       :
                                                       :
                   - against -                         :
                                                       :
                                                       :
A. JOHN LEONTAKIANAKOS, JOHN                           :
SEETOO                                                 :
                                                       :
                                      Defendants.      :
                                                       :
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __12/31/2019__

14-CV-493 (VSB)

**ORDER**

**VERNON S. BRODERICK, United States District Judge**

      I held a conference with the parties via telephone on December 30, 2019, to discuss the issues relating to service of Plaintiff's motion for summary judgment. Upon consideration of the issues raised at the conference it is hereby:

      ORDERED that Defendants' opposition, if any, to Plaintiff's motion for summary judgment (Doc. 252) is due on February 9, 2020, and Plaintiff's reply, if any, is due on March 2, 2020. I have attached a copy of Plaintiff's summary judgment papers to this Order, which will be sufficient for service upon the Defendants.

      The Clerk of Court is respectfully directed to mail a copy of this Order and its attachments to the pro se Plaintiff and Defendants.

SO ORDERED.

Dated: December 31, 2019
     New York, New York

Vernon S. Broderick
United States District Judge

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

TIMOTHY ANDREW MCCAFFREY,

                                   Plaintiff,          1:14 Civ. 00493-vsb

           - against -
                                                       **NOTICE OF MOTION**

GATEKEEPER USA, INC., ASGARD
INTERNATIONAL, INC., ARES VENTURES
INC., A. JOHN LEONTAKIANAKOS, and
JOHN SEETOO,

           Defendants.

NOTICE of MOTION

Please Take Notice, upon the accompanying memorandum of law in support of plaintiff's motion for summary judgment, plaintiff declaration, attached appendix of exhibits, and statement of undisputed fact, plaintiff Timothy Andrew McCaffrey moves this Court and the Honorable Vernon S. Broderick on October 14, 2019 or as soon thereafter as may be heard for entry of order pursuant to FDRCP 56 and Local 56.1 granting plaintiff 's motion for summary judgment, and awarding plaintiff the award sought in this matter and such other relief deemed just and proper by the Court.

Dated: New York, New York
       August 26 __, 2019

                                   Respectfully submitted,


                                   By:_____
                                   Timothy Andrew McCaffrey, *Pro Se*

CERTIFICATE of SERVICE

I hereby certify that Plaintiff's Notice, Memorandum, Statement of Fact and the

Declaration with Appendix, were filed electronically and served on defendants by

email.

Dated: New York, New York
       August 26 __, 2019

                         Respectfully submitted,

                         By:_____
                          Timothy Andrew McCaffrey, *Pro Se*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

TIMOTHY ANDREW MCCAFFREY,

                              Plaintiff,

                 - against -

GATEKEEPER USA, INC., ASGARD
INTERNATIONAL, INC., ARES VENTURES
INC., A. JOHN LEONTAKIANAKOS, and
JOHN SEETOO,

          Defendants.

1:14 Civ. 00493-vsb

**STATEMENT OF FACT**

## STATEMENT OF FACT PURSUANT TO LOCAL RULES 56.1

1.      In or about July 2011, Gatekeeper began offering shares of its common stock for sale in private transactions, stating "only from 'accredited investors' who satisfy the suitability standards" under federal securities regulations (App. A p.2).

2.      In or about early 2012, Seetoo approached plaintiff with the intention of inducing plaintiff to invest in Gatekeeper (App. B p.1). In an email, Seetoo included subscription documents, business and marketing literature, and a proof of concept (POC) report ( App. B pp.3-8).

3.      In a subsequent email to plaintiff Seetoo sent the PPM dated July 2011 (App. B p.3).

4.      Seetoo told plaintiff "the recent market price is $2.75-$3.25" but that plaintiff could buy through " [the Company's] Private Placement…at $1" a share (App B pp.1-10).

5.      Seetoo also offered to Plaintiff the same sorts of compensation that Seetoo was receiving for enlisting other investors (App. B p.10, App. G LeonSEC).

6.      Seetoo also told Plaintiff of the opportunity for a short squeeze and indicated that there was opportunity for returns greater than 1000% (App. B pp.14, 33).

7.      Seetoo knew at the time but did not disclose to plaintiff that the public price was being kept artificially high through the buying activities of (among others) a Minnesota financial advisor named Howard Richards, working in concert with the defendants (App. C pp.4-6).

8.      In addition to Seetoo, the two controlling officers of Gatekeeper, Leontakianakos and Gatekeeper CEO Wishart, each had knowledge of Mr. Richards' manipulation of the market in Gatekeeper shares (App. C *Id*.).

9.      Seetoo further represented that the Company was "in the midst of closing out the balance of a $10M Reg-D private placement with some institutional sized investors . . . [and that] $4M has already been Patriot Act cleared and allocated to a designated account" (App. B pp.1-12).

10.     Plaintiff was told and it was outlined in the PPM that capitalization of the Company meant large scale production of a device called CAMS (App. B pp.1-10) (App. A pp.2-35).

11.     The CAMS device does not exist (App. G LeonSEC). No one associated with Gatekeeper has ever seen or touched it (*Id*. Leon. Wish. Seetoo).

12.     Seetoo and Asgard further represented through a hyperlink at the Asgard website to the website of Development Solutions that Gatekeeper was already "Funded $10M" (App. M pp.1-4).

13.     No such deal or deals were ever consummated.

14.     Seetoo represented that Gatekeeper was "about to get listed on the NASDAQ," (App B pp. 13, 18, 34, 38).

15.     The same claims were made publicly as far back as at least 2009 by Gatekeeper CFO John Leontakianakos and Gatekeeper as instructed by CEO Wishart (App. F pp.6, 46) (App. G LeonSEC).

16.     Plaintiff told Seetoo his participation was dependent on a distribution from a property sale (App. B pp.1-10), and in an email to Seetoo he expressed doubt that he would able to participate in time for the closing of the Private Placement because he had no funds (App B p.10).

17.     Seetoo offered to "get [plaintiff] an extension of 3 weeks or so after the close" and told plaintiff that plaintiff could "pre submit signed docs" and that plaintiff could "pay later" (App B pp.9-10).

18.     Seetoo also stated that a company called Ares would be handling the sale of smaller lots for Gatekeeper during the private placement. (App B pp.14, 15, 21, 22, 25).

19.     Defendants presented plaintiff with subscription documents that included the Private Placement Memorandumpresented to plaintiff, dated July 1, 2011(App B pp.6-7).

20.     Defendant Seetoo also presented Gatekeeper business plans, financials, and related promotional documents to plaintiff (*Id.*) which had been created for the Company by Gatekeeper CEO James Wishart (App. C p.9) (App. G LeonSEC).

21.     Wishart had provided these materials for Gatekeeper by email to Seetoo and Leontakianakos for distribution to potential investors in the Company just days prior to their being delivered to plaintiff (App. C p.9)

22.     Seetoo assured plaintiff that closings, filings, and tradability of shares was imminent (App B pp.29, 33). Plaintiff insisted that everything Seetoo said must be true or he could not afford to participate (App B p.27).

23.     Wishart was also responsible for coordinating and directing publicity activity for Gatekeeper and directed both Leontakianakos and Seetoo in this regard (App. C p.41 Following) and (App. G LeonSEC).

24.     Plaintiff was proffered a stock transfer agreement by email by Seetoo and instructed to wire his funds for the purchase of the shares to Ares (App. B).

25.     Relying on Seetoo's assurances and on the accuracy of the materials presented to him, plaintiff signed the stock transfer agreement and wired $50,000 to Ares (App. B).

26.     The stock transfer agreement stated that Ares was a "corporation" "in good standing" and organized in "the State of Nevada." Plaintiff understood GateKeeper to be a Nevada Company.

27.     Unbeknownst to plaintiff Ares was owned by Leontakianakos, the Executive Vice President of GateKeeper.

28.     Unbeknownst to plaintiff, Ares was not a "corporation" "in good standing".

29.     Unbeknownst to plaintiff, Ares was not organized in Nevada but was organized in New York.

30.     Leontakianakos personally generated the Ares stock transfer agreement (App. G LeonSEC).

31.     On or about September 2013, Plaintiff approached Gatekeeper to propose a settlement to include return of the purchase price.

32.     Defendants disclosed to plaintiff that his purchase had not been, as he had been led to believe by defendants, from the Company, but from an unidentified third party.

33.     The money that plaintiff wired to Ares was spent by Leontakianakos for his personal use (App. G LeonSEC).

34.     At various time, Leontakianakos has used the proceeds from sales of GateKeeper shares by Ares for both his personal use and to pay the expenses of GateKeeper (App. G LeonSEC).

35.     Seetoo received compensation for directing plaintiff to purchase shares in GateKeeper through Ares. (App. G LeonSEC).

36.     The third party was in fact Angelica Leontakianakos, the wife of defendant Leontakianakos. (App. M pp.95-108).

37.     From at least 2008 to 2012, Gatekeeper issued a series of press releases at the Gatekeeper website and elsewhere, written by Leontakianakos and Wishart and "signed off on" by Wishart (App. F) (App. G LeonSEC).

38.     Prior to his purchase of shares of GateKeeper plaintiff read these press releases at the GateKeeper website and elsewhere.

39.     Press releases, and promotional literature distributed to plaintiff and others, represented Gatekeeper as a viable company with a viable technology ready for market and in some cases already on the market (App. F)

40.     In truth, Gatekeeper's was a dire financial situation. CEO Wishart and the defendants took part in email discussions pertaining to the floundering Company's gloomy prospects within 4 weeks of their decision to sell plaintiff shares (App. C pp.21-23). This was less than 10 days after circulating a new PPM dated May 31, 2012 (App. D), and about two weeks before circulating a third dated July 30, 2012 (App. E), and was in addition to ongoing circulation of Ares purchase agreements (App. E pp.1-10).

41.     Gatekeeper had sought out loans from shareholders to pay for OTC filings, CEO James Wishart's insurance, legal retainers, and other common fees as well as personal loans for themselves (App C) (App. G LeonSEC). They did not disclose lawsuits to Plaintiff that were ongoing and would affect their ability to address their public statements about Gatekeeper (App. C p.27).

42.     The defendants participated in and were privy to email exchanges in which the lack of capital and the lack of progress and the likelihood of failure were acknowledged and discussed openly (App. C pp.1-3, 8, 10-12, 21-23, 38-).

43.     Gatekeeper leadership and the defendants represented themselves as industry professionals with special knowledge of the financing of publically traded companies. But other industry professionals they approached complained in emails and communications delivered to the defendants that Gatekeeper's model for financing was not viable and would never receive the sought after funding in its current state. Some

even questioned the legitimacy of the Company and the existence of the technology itself (App. C).

44.     In spite of knowing that these questions loomed, the defendants arranged for plaintiff to purchase GateKeeper shares.

45.     Press releases in 2012 and about imminent SEC audits and filings parroted similar Press releases in 2009 and 2010. Each of them coinciding with PPMs and share sales and market manipulation.

46.     In 2007 or 2008 Gatekeeper put out a Request for Proposals (RFP), to which they received one (1) response (App. G Leon). This response was from CSL the owner of the CAMS device. CSL is an alias for Richard Sowden. Sowden is a friend and associate of defendants known prior to the RFP (App. G Seetoo. Wishart. Leon). This is not acknowledged in press releases put out by the company, nor is the fact the CSL is not a legitimate company (App. J pp.1-6).

47.     Beginning around 2008 or 2009, Gatekeeper began the promotion of Private Placement Offerings and the distribution of Promotional Materials including Business Plans, Marketing Documents, and PPMs (App. F) (App. H). Distribution of these materials continued each year following until at least May 2015 (App F pp.50-51), nearly 18 months after this action commenced, and a year after the SEC acted against Howard Richards, an action which included the deposition of Leontakianakos affixed in App. G of this document.

48.     Gatekeeper also began to make public statements about Gatekeeper's activities, prospects and plans, including the purchase of companies, SEC auditing services, and forthcoming moves from the Pink Sheets to the NASDAQ (App. F)

49.     These public statements included press releases about the CAMS device and the developer of the CAMS device, CSL, a company James Wishart characterized as "world class team of experts" (App. F pp.1-5, 14), and which he indicated would "immediately" "accelerate" manufacture of the CAMS device (*Id.*).

50.     There is no "world class tea of experts" affiliated with CSL developing security technology for GateKeeper.

51.     Press releases also announced the purchase of a Company called Bio Avenge, about which purchase Wishart is quoted saying "This transaction has significantly increased shareholder value as it has added a war chest of viable assets." (*Id.* pp.4-6).

52.     Statements such coincided with market activity in the publicly traded shares of GateKeeper and the distribution of the PPMs (*Id.* pp.7, 12).

53.     Gatekeeper also issued press releases about purchase orders made by an organization called BACO, the value of which could be in excess of "$300,000,000" and exclaimed that the first "draw down" could take place "within the next 30 days." (*Id.* p.9).

54.     Statements on Twitter and elsewhere by Gatekeeper further stated that the CAMS technology was already on the market (*Id.*pp.14, 41-46) and was aiding in the fight against terrorism within the American Homeland (*Id.*).

55.     By 2010 Gatekeeper had accumulated multiple promissory letters and wire transfer confirmation documents which showed incoming investments totaling tens of millions of dollars (App. K). And OTC filings in 2010 (App. K) and again in 2012

confirm this (App. K). In 2011, Gatekeeper even issued a press release announcing the completion of $8 Million in funding (*Id. p.17)* similar to the one in 2009 (App. F p.12).

56.     Gatekeeper continued issuing press releases and making public statements about their activities, hiring Phoenix Partners to pursue financing and arranging to conduct a Proof of Concept (POC) for the purpose of attracting further investment in Gatekeeper (App. F) In the press release, Gatekeeper CEO James Wishart stated that Phoenix has an "impeccable reputation as does its principal []" (App F pp.17-28, 42)

57.     And again, in 2011 these same activities continued in an updated and current iteration for that year, complete with Business Plans, Marketing Materials an a new PPM (App A). At that time, the Company represented that it would accept share subscriptions "only from 'accredited investors' who satisfy the suitability standards" under federal securities regulations and that upon completion of the funding round all restricted legends on shares would be removed and market liquidity would follow (App A.) Clearly plaintiff was an unsophisticated investor, or he would have taken one look at the last 5 years of PRs and asked "where's the money?"

58.     BACO is defunct in Texas, the state of its original incorporation, and in Florida (App J pp.7-8), and was at the time of Plaintiff's purchase despite the 2008 press release touting the deal worth hundreds of millions remaining at the Gatekeeper website for the public to see. When asked about Larry Mael, the CEO of BACO, Gatekeeper CEO James Wishart, who issued thepress release related to the $300,000,000 purchase order, did not even know Mael was (App. G Wishart).

59.     By 2010, Phoenix had been administratively dissolved by the California Secretary of State for failure to pay taxes and its principal, rather than having an

"impeccable" reputation, had previously been convicted of bank fraud and served time in a Federal Penitentiary, facts withheld by defendants from the public and the plaintiff (App J pp.12-19). Gatekeeper even issued additional press releases about Phoenix as late as December 2013.

60.     Even the POC produced by Phoenix for Gatekeeper was a sham. Far from being an objective document providing potential investors with the necessary information to determine investment activity, all defendants including Wishart actually participated in editing the document itself (App. M pp.8-11) (App. C).

61.     BioAvenge turned out to be an alias for a defunct Delaware corporation, Capital Genomix (CGI) (App. L) (App. J pp.10-12), mired in debt, including back taxes, judgments and liens, and already under the effective control of Leontakianakos and Gatekeeper CEO James Wishart (*Id*.). Leontakianakos, Wishart, and their partners, William Hearl and Thomas August both of Maryland, prior to or immediately after the purported sale had stripped BioAvenge of any valuable assets including one now worth according to these same guys … $300,000,000 (*Id*.), a popular number indeed. These assets were being concurrently marketed elsewhere by other companies unrelated to Gatekeeper but still under the control of Leontakianakos and Wishart (*Id*.).  CGI and Leontakianakos settled a lawsuit in the Eastern District with details strikingly similar to this case (*Id*.).

62.     No "immediate" deployment or development by Gatekeeper of any devices or related technology occurred or has ever occurred as a result of this "acquisition" and no device or technology based on that acquisition has been "deployed in the field of Bio-Terrorism" or any other field by Gatekeeper.

63.     There is no public record of the acquisition by Gatekeeper of "BioAvenge" or the assignment of any of its intellectual assets to Gatekeeper.

64.     Gatekeeper itself was being kept afloat from personal contributions of its officers (App B pp.40-45).

65.     According to SEC testimony by Leontakianakos CAMS was not and never had been in a marketable state of development (App. G LeonSEC).

66.     Seetoo was compensated for his Gatekeeper selling activities (*Id*.)

67.     Email evidence and SEC testimony indicate that this was a free for all. Seetoo makes no distinction for Leontakianakos between selling for Ares, selling for him, and selling for Gatekeeper when discussing almost 1 million dollars in sales (App G. LeonSEC)

68.     Leontakianakos confirms this in the SEC deposition remarking that once he received money from the sale of shares he distributed a portion to Wishart and Gatekeeper (*Id*.) and paid Seetoo for his work (*Id*.) hustling in New York (*Id*.) (App. G Leon).

69.     Nevertheless, CEO Wishart, who is a fraud detection professional (App G *Wishart*), had sole control over the Companies Banking and Financial Accounts (App G LeonSEC). And he had sole control over all documents and materials used to promote or otherwise promulgate information about the Company (*Id*.).

Dated: New York, New York
       August 26 __, 2019

                                          Respectfully submitted,


                                   By:_____
                                       Timothy Andrew McCaffrey, *Pro Se*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

TIMOTHY ANDREW MCCAFFREY,

                                        Plaintiff,                    1:14 Civ. 00493-vsb

                    - against -                                      **MEMORANDUM OF LAW**

GATEKEEPER USA, INC., ASGARD
INTERNATIONAL, INC., ARES VENTURES
INC., A. JOHN LEONTAKIANAKOS, and
JOHN SEETOO,

              Defendants.

*I. Introduction*

This is an action brought by plaintiff against defendants seeking relief for injuries due to defendants' securities and marketing fraud to sell shares of Gatekeeper USA Inc. ("Gatekeeper" or the "Company") to plaintiff and the public in New York State and elsewhere. Gatekeeper, despite marketing claims to the contrary, had no business and no prospects. The market price of its shares was kept artificially high through manipulative buying. And investor interest was cultivated through deceitful press releases and misleading public and private statements. The Court has previously issued a Judgment of Default in this case in favor of plaintiff against all corporate defendants, including Gatekeeper itself, Asgard International, Inc. ("Asgard"), and Ares Ventures, Inc. ("Ares").  Plaintiff now moves the Court to grant Summary Judgment against the remaining individual defendants John Seetoo ("Seetoo) and John Leontakianakos ("Leontakianakos"). Additionally, this memorandum is submitted to the Court  in support of a damages award and in moving the Court for the imposition of sanctions on all

defendants for habitual dilatory tactics, frauds upon the Court, spoliation of evidence, and Rule 37 violations over the course of this case, now nearing its seventh year.

## II. Argument

### A. The Summary Judgment Standard.

A motion for summary judgment should be granted if the record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Reasonable inferences must be drawn against the moving party, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 474 U.S. 574, 587-88 (1986). "When a party has given clear answers to unambiguous questions [in depositions] which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins and Assoc. v. U.S. Indus.*, 736 F.2d 656, 657 (11th Cir.1984).

### B. The Defendants Committed Securities Fraud

Section 17(a) of the Securities Act proscribes fraudulent conduct in the offer or sale of securities and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder proscribe fraudulent conduct in connection with the purchase or sale of securities. *U.S. v. Naftalin*, 441 U.S. 768 (1979). Securities Act Section 17(a) prohibits fraudulent conduct by any person natural or otherwise in the offer or sale of securities. It is unlawful therefore under Section 17(a)(1), to "employ any device, scheme, or artifice to defraud." Likewise, under Section 17(a)(2), it is unlawful to "obtain money or property by means of any untrue

statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." Furthermore, under Section 17(a)(3) it is proscribed for any person whether natural or other to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).

Exchange Act Section 10(b) and Rule 10b-5 prohibit fraudulent conduct by any person in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240. 10b-5. Under Rule 10b-5(a) it is unlawful to "employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.1b-5. Accordingly in Rule 10b-5(b) it is clearly unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id*. Rule 10b-5(c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." *Id*.

In this case it is clear that all defendants, corporate and individual, as well as their CEOs and officers, including James Wishart of Gatekeeper, committed securities fraud by using materially false statements and omissions to sell securities to the unsuspecting public. The placement memorandum offered to the plaintiff and the various memoranda issued over a course of years were not simply unregistered and out of date but steeped in false statements. It is clear also that marketing documents, press releases, and public and private statements too were riddled with false and misleading statements and that they all

omitted material information necessary to make the other statements not misleading.

*C. Defendants Had High Levels of Scienter*

In South Cherry Street, LLC v. Hennessee Group LLC, 573 F. 3d 98 the Second Circuit

laid out the prerequisites to making a claim on which relief can be granted under § 10(b)

and Rule 10b-5:

> A plaintiff must plead, *inter alia,* that in connection with the purchase or sale of
> securities, the defendant made a false representation as to a material fact, or
> omitted material information, and acted with scienter. *See, e.g., Tellabs, Inc. v.
> Makor Issues & Rights, Ltd.,* 551 U.S. 308, 318, 321, 127 S.Ct. 2499, 168
> L.Ed.2d 179 (2007); *Chill v. General Electric Co.,* 101 F.3d 263, 265 (2d
> Cir.1996) ("*Chill*"); *In re Time Warner Inc. Securities Litigation,* 9 F.3d 259, 264
> (2d Cir.1993), *cert. denied,* 511 U.S. 1017, 114 S.Ct. 1397, 128 L.Ed.2d 70
> (1994). The Supreme Court has defined scienter as "`a mental state embracing
> intent to deceive, manipulate, or defraud.'" *Tellabs,* 551 U.S. at 319, 127 S.Ct.
> 2499 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct.
> 1375, 47 L.Ed.2d 668 (1976)

In the present case, there is no issue of intentionality and recklessness.  At all times each

defendant and corporate officers had the requisite scienter to know and act with

intentional disregard that 1. Plaintiff was not a qualified investor, and 2. Gatekeeper had

no ability or intention of submitting the requisite SEC filings to remove the restrictions

on Plaintiff's shares or any of the other shares, and 3. There were no prospects for

making the Company's CAMS technology commercially viable in its current state of

development, and 4. The financial information set forth in the offering documents

provided to plaintiff were outdated, incomplete, and misleading, and 5. Public statements

of Gatekeeper's prospects were manipulative devices part of a scheme to induce

investments, and 6. The Company had not secured private equity financing and had no

prospects for doing so, and 7. Gatekeeper's own principles and associates knew of and

discussed openly the obstacles to progress, and 8. Any and all monies invested were diverted away from the Company's professed capitalization goals and to the defendants themselves for their own use, and 9. The Company had no current or prospective contracts with the U. S. government or private shipping companies, and finally 10. The market price for Gatekeeper shares was the result of market manipulation and not an accurate reflection of demand for its public shares or market interest.

Defendants each in fact benefited in a concrete and personal way from the fraud, engaged in clearly illegal behavior, and knew facts and had access to information that showed that public statements were not accurate. And, at least in the case of Ares, intentionally failed to monitor and check information. While the agreement falls under state contract law, its fraudulence is itself evidence of securities and common law fraud.

*D. Common Law*

The essential element of Common Law Fraud is knowledge of the falsity of an omission or misrepresentation and the reliance upon the misrepresentation or omission, which resulted in damages. Plaintiff is an academic by training. His background is in Classical Greek and Latin and Chinese Literature and Linguistics. He had no training, knowledge, or experience in finance or securities at the time of his purchase. He relied on defendants as the experts they presented themselves as.

*E. Negligent Misrepresentation*

It is settled in case law that Negligent Misrepresentation requires a special relationship of privity. That the information was incorrect. And a reasonable reliance on the information

*J.A.O. Acquisition Corp. v Stavitsky,* 8 NY3d 144, 148 [2007]. The record reflects this without need to expound.

### F. Defendants and Wishart Should Be Held Personally Liable Under Federal Law

Plaintiff also asks the Court to impose a civil monetary penalty pursuant to Section 20 of the Securities Act. *See* 15 U.S.C. § 77(t)(d); 15 U.S.C. § 78(u)(d)(3). Mr Wishart provided the material support and aid to individual defendants and meets the definition of a controlling person as outlined in the code. Gatekeeper has already had a default judgment against it in this matter. Mr Wishart's actions, as CEO in full control of Gatekeeper, were repetitive and occurred over many years and were part of a continuing pattern of misconduct from fraud detection professional. His misconduct involved a high degree of scienter of the sort that warrants piercing the corporate veil.

### G. Leontakianakos is Liable under New York Law

As in *Spring Val. Improvements, LLC v. Abajian,* 40 A.D.3d 619, 619-20 (2d Dep't 2007), the Appellate Division, Second Department, held that, *"A person who purports to act on behalf of a dissolved corporation is personally responsible for the obligations incurred."*

### H. Penalties

When deciding whether and in what amount to assess civil penalties, courts consider the following factors, among others: "(1) the egregiousness of the violations; (2) the isolated or repeated nature of the violations; (3) the defendant's financial worth; (4) whether the defendant concealed his trading; (5) what other penalties arise as the result of the

defendant's conduct; and (6) whether the defendant is employed in the securities industry." *SEC v. Happ*, 392 F.3d 12, 32 (1st Cir. 2004).

The defendants all have a history of this sort of activity even prior to their years long activity in the promotion of Gatekeeper. Seetoo was subject to a FINRA action for misdirecting client dollars. Gatekeeper itself the record shows emerged as a sort of clearing house for intellectual property of which Leontakianakos, Wishart, and their partners, wished to defraud investors. Gatekeeper activity began in 2007 and continued into 2015, nearly a decade of deceit. Given the egregious conduct over many years and the histories of the defendants as individuals and as corporate officers, the Court should respectfully impose the maximum monetary penalty available, including pre and post judgment interest *SEC v. Tome*, 638 F. Supp. 638, 639 (S.D.N.Y. 1986), aff'd, 833 F.2d 1086 (2d Cir.1987) (court has discretion to award prejudgment interest).

*III. A Brief Argument for Sanctions*

Throughout the nearly 6 years of this case since filing January 24, 2014, defendants their principals and officers have habitually engaged in repeated missed deadlines, ignored court orders, discovery delays, shirked responsibilities to disclose, verbally abusive interrogatories, invective, attacks against plaintiff's family, refusal to answer questions posed by the Court at hearing, fraudulent notarizations, dubious sworn declarations and affidavits, malingering, missed hearings, refusal to discuss settlement, and excuses which individually sounded like good cause but when taken together show a pattern of prevarication. It is all on the docket.

They have engaged in spoliation of evidence resulting in the disappearance of entire websites, which were named in plaintiff's complaint. Emails defendants claimed were

lost and therefore unavailable to discovery requests and disclosures were available to SEC investigators. Some reappeared in filings made last year by defendant Seetoo.

In January of 2019 the Court referred the case to Magistrate Judge Lehrbuger for settlement. From February of 2019 to August of this year defendants engaged in settlement negotiations with plaintiff. Negotiations included terms for dismissal of outstanding suit and for all outstanding awards. The patience, care, and legal acumen of Judge Lehrburger, facilitated the negotiations. Judge Lehrburger displayed a master's facility for dispute resolution and guided parties to an agreement that protected all, satisfied none, and ticked every box of every concern of all sides. Defendants could not but move toward agreed upon terms. That they never intended to settle, however, is apparent from their ultimate refusal to sign the very agreement they themselves had negotiated. They abused the Court's time and resources. And they delayed resolution of this case by at least 10 months.

It is hard to determine an amount in cases of pro se litigants. There is case law to support it. Instead, plaintiff would suggest to the Court that it be fitting to sanction the defendants with the amount they agreed to in settlement negotiations $160,000.

*IV. Conclusion*

It is for the above reasons that plaintiff asks the Court to grant his request for summary judgment as well as all requests for awards and sanctions.

Dated: New York, New York
      August 26 __, 2019

                                 Respectfully submitted,


                            By:_____
                            Timothy Andrew McCaffrey, *Pro Se*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

TIMOTHY ANDREW MCCAFFREY,

                              Plaintiff,              1:14 Civ. 00493-vsb

          - against -
                                                     **DECLARATION**
GATEKEEPER USA, INC., ASGARD
INTERNATIONAL, INC., ARES VENTURES
INC., A. JOHN LEONTAKIANAKOS, and
JOHN SEETOO,


          Defendants.

---

PLAINTIFF DECLARATION

I Timothy Andrew McCaffrey, Declare before this Court and the Honorable Vernon S.

Broderick under penalty of perjury that I have personal knowledge of the matter

before the Court and that all statements made in the foregoing are true and accurate

and that all exhibits and evidence are true and accurate.

Dated: New York, New York
          August 26 __, 2019

                              Respectfully submitted,


                         By:_____
                              Timothy Andrew McCaffrey, *Pro Se*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

TIMOTHY ANDREW MCCAFFREY,

                              Plaintiff,          1:14 Civ. 00493-vsb

        - against -

GATEKEEPER USA, INC., ASGARD
INTERNATIONAL, INC., ARES VENTURES
INC., A. JOHN LEONTAKIANAKOS, and
JOHN SEETOO,

                              Defendants.

**Plaintiff Appendix in Support of Motion for Summary Judgment**

Dated: New York, New York
        August 26 __, 2019

                              Respectfully submitted,


                        By:_____
                              Timothy Andrew McCaffrey, *Pro Se*

**Appendices**

    **A.  Placement Memorandum July 2011**

    **B.  Emails Defendant Seetoo**

    **C.  Emails SEC Subpoena Richards**

    **D.  Placement Memorandum May 2012**

    **E.  Placement Memorandum July 2012, Ares Subscription Docs May 2012-**

       **July2012**

    **F.  Gatekeeper Press releases and Promotions**

    **G.  Depositions. 1. Leontakianakos by SEC 2. Wishart by Plaintiff 3.Seetoo by**

       **Plaintiff 4. Leontakianakos by Plaintiff**

    **H.  Placement Memorandum September 2009**

    **J.  Secretary of State Revocations etc.**

    **K. Incoming investment Records**

    **L. Capital Genomix, BioAvenge, Hearl, LAMP VAX**

    **M. Miscellaneous**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

TIMOTHY ANDREW MCCAFFREY,

                              Plaintiff,

                - against -

GATEKEEPER USA, INC., ASGARD
INTERNATIONAL, INC., ARES VENTURES INC.,
A. JOHN LEONTAKIANAKOS, and JOHN
SEETOO,

                              Defendants.

1:14 Civ. 00493-vsb

**FIRST AMENDED COMPLAINT**

## INTRODUCTION

1.      Plaintiff, Timothy Andrew McCaffrey alleges the following against defendants

GateKeeper USA, Inc. ("GateKeeper" or "Company"), Asgard International, Inc. ("Asgard"),

Ares Ventures Inc. ("Ares"), A. John Leontakianakos, and John Seetoo as and for his Complaint

for fraud, misrepresentation, and market manipulation in connection with the promotion and sale

of the common stock of GateKeeper in violation of Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act") (codified at 15 U.S.C. §§ 78j(b) & 78t(a)), Rule

10b-5 of the Exchange Act (codified at 17 C.F.R. § 240.10b-5), and Section 17(a) of the

Securities Act of 1933 (the "Securities Act") (codified at 15 U.S.C. § 77q(a)), as well as

applicable state and common law.

## PARTIES

1.      GateKeeper is a Nevada corporation, which purports to be "engaged in the

continued development and initial delivery of a proprietary device within the maritime industry

in a continuing effort to meet government initiatives to prevent potential terrorist attacks on the

United States." The Company has promoted itself as having developed a device called a

Container Automated Monitoring System ("CAMS"), a pocket-sized electronic device that

GateKeeper claims is able to detect the presence of chemical, biological and radioactive substances in large shipping containers shipped to North American ports.

2.      Despite its optimistic and aggressive public statements and despite having been in business since at least 2007, GateKeeper has, to date, generated no revenues whatsoever. Moreover, since its inception, GateKeeper has not secured a single government or private contract, despite public statements of defendant Leontakianakos that, as early as 2009, GateKeeper "[had] contracts with the Department of Homeland Security."

3.      Defendant Leontakianakos is the Chief Financial Officer and Senior Vice President of Finance and a Director of the Company. Unbeknownst to plaintiff, Leontakianakos had been associated with organized crime members, including having been identified as being a witness in a murder-for-hire investigation in the 1990s.

4.      While GateKeeper is organized in Nevada and is headquartered in the State of Maryland, Leontakianakos from at least January 2012 fulfilled his duties as Vice President, CFO, and Director of the Company from his home located at 28 McLane Drive, Dix Hills, New York, 11746.  These activities included, but were not limited to, communications with finance professionals in the State of New York and elsewhere regarding their activities on behalf of their clients and on their own behalf as they related to the buying and selling of GateKeeper shares, initiation of private stock transactions, approval of private stock transfers by the Company's stock transfer agent, promotional activities related to procuring investments in the Company, and provision of direction to agents and representatives, including promoters of GateKeeper operating in New York State and elsewhere.

5.      Defendant Ares Ventures Inc. is a corporation with offices at 28 McLane Drive, Dix Hills New York 11746. On information and belief, defendant Leontakianakos is the

principal and owner of Ares. Although at one point a registered New York corporation, as of April 27, 2011, Ares ceased to be an active corporation in New York due to either dissolution by proclamation or annulment of authority. Nevertheless, in 2012, plaintiff was directed by defendant Seetoo, at the behest of Leontakianakos, to wire money to Ares as part of defendants' scheme to defraud plaintiff and other members of the investing public. Although it was represented to plaintiff that his shares in GateKeeper were being purchased directly in the Company, he was, in fact, instructed to wire his money for purchasing the shares to Ares.

6.      Defendant Asgard is a New York corporation with its offices in New York City. Asgard holds itself out as a "merchant banking and financial consulting company" that provides "project and corporate finance services" to companies in various industries. However, there is no record of Asgard holding any securities industries licenses.  From at least 2011 Asgard acted as an agent of GateKeeper.

7.      Defendant Seetoo is Asgard's sole officer and employee. Seetoo held himself out to plaintiff as an experienced securities and corporate finance advisor. According to securities industry records, Seetoo has not been registered as a stockbroker or investment advisor since 2006. During the period he was registered with FINRA, Seetoo received at least two formal customer complaints against him alleging unauthorized transactions in client accounts.

8.      Seetoo also serves as Executive Vice President, International Business Development, at GateKeeper. Prior to becoming an executive of GateKeeper, Defendant Seetoo acted as an agent of GateKeeper and a promoter of its stock. In exchange for his stock promoting services, Seetoo, upon information and belief, received valuable consideration from GateKeeper, including warrants to purchase GateKeeper stock.

3

9.     Seetoo "concurrently serves" as Senior Vice President at a company Development Solutions, which according to the Asgard website shares clients, including GateKeeper, with Asgard. A hyperlink at the Asgard website connects it to the Development Solutions website. Development Solutions is not a party to this suit.

10.    Plaintiff is a struggling independent filmmaker with an exclusively academic background in linguistics and ancient Greek and Latin. He has little or no experience in the stock market or in investment and securities. Plaintiff's annual income is less than $50,000 and, as a result of his investment in GateKeeper, he has virtually no net worth. In reliance upon the representations of defendants and the urging of Seetoo, on or about May 30, 2012, plaintiff invested all of his money, including the proceeds of a small inheritance, in 50,000 shares of GateKeeper common stock for a purchase price of $50,000.

11.    From at least as early as December 2011, through the present, defendants engaged in a fraudulent scheme to artificially inflate the public price of GateKeeper's stock and create the illusion of market demand for the stock, in order to induce investors such as plaintiff to purchase its stock in private transactions.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over the subject matter of this action under § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

13.    Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). In addition, the causes of action set forth herein occurred and/or accrued in this District, among other places. At all times relevant to this action, GateKeeper, Asgard, and Ares maintained offices and/or conducted business in this District, and

the sale and/or promotion of GateKeeper stock that is the subject of this action occurred in this District.

14.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## DEFENDANTS' FALSE AND MISLEADING ACTIVITY AND STATEMENTS

15.    In or about July 2011, GateKeeper began offering shares of its common stock for sale in private transactions. At that time, the Company represented that it would accept share subscriptions "only from 'accredited investors' who satisfy the suitability standards" under federal securities regulations. Applicable regulations define an "accredited investor" as an individual with an annual income for each of the past two consecutive years of at least $200,000, or a net worth in excess of $1,000,000.

16.    In or about early 2012, plaintiff met Seetoo through a potential film project that plaintiff's mother hoped to develop, and for which Seetoo expressed an interest in procuring financing.

17.    Unable to participate in the film project with plaintiff's mother, Seetoo approached plaintiff with the intention of inducing plaintiff to invest in GateKeeper. Seetoo repeatedly made optimistic and upbeat statements about GateKeeper to plaintiff, telling him "I want you to get in on this."

18.    As an inducement to plaintiff to invest, Seetoo told plaintiff "the recent market price is $2.75-$3.25" but that plaintiff could buy through " [the Company's] Private Placement…at $1" a share.

19.     In response to plaintiff's insistence that any shares he purchased would have to be liquid and freely tradable, since the purchase price represented virtually his entire net worth, Seetoo repeatedly represented to plaintiff that the requisite SEC filings would be made imminently, stating that "the [Rule 144] restriction will be lifted upon filing of an [SEC Form] S-1 Registration . . . which will be entered upon closing of the Reg-D."

20.     Seetoo further represented that GateKeeper was "about to get listed on the NASDAQ," The same claims were made publicly as far back as at least 2009 by GateKeeper CFO John Leontakianakos. Seetoo also stated that "we [GateKeeper] would be making the requisite Securities and Exchange Commission filings imminently" so that the stock could be freely traded. And with this, there would be liquidity to GateKeeper shares on the open market.

21.     At no time did Seetoo inquire of plaintiff's investment experience, income, or net worth. Seetoo knew that plaintiff was of limited means and limited investment experience. Plaintiff informed Seetoo that his ability to invest was dependent on his receipt first of a small distribution from the sale of his grandmother's house and that otherwise he could not afford to purchase any shares whatsoever. Nevertheless, Seetoo continued to urge plaintiff to invest his entire net worth in GateKeeper's stock.

22.     On April 6, 2012, plaintiff sent an email to Seetoo in which he expressed doubt that he would able to participate in time for the closing of the Private Placement, because the sale of his grandmother's house had not yet closed. Seetoo, in a reply email, offered to "get [plaintiff] an extension of 3 weeks or so after the close" and told plaintiff that plaintiff could "pre submit signed docs" and that plaintiff could "pay later." Seetoo also, in a separate email, informed plaintiff that a company called Ares would be handling the sale of smaller lots for GateKeeper during the private placement.

23.     In connection with the marketing of GateKeeper and the promotion and sale of GateKeeper's stock, defendants presented plaintiff with subscription documents that were false and misleading. In particular, the Private Placement Memorandum (PPM) presented to plaintiff was dated July 1, 2011, and thus, at time of plaintiff's purchase on or about May 30, 2012, contained information that was outdated, incomplete and misleading. Defendant Seetoo also presented GateKeeper business plans, financials, and related promotional documents to plaintiff, which had been created for the Company by GateKeeper CEO James Wishart. Wishart had provided these materials for GateKeeper by email to Seetoo and Leontakianakos for distribution to potential investors in the Company just days prior to their being delivered to plaintiff.

24.     Defendants also misrepresented to plaintiff the identity of the seller of the stock in the Company.  First, as stated above, although it was represented to plaintiff that his shares in GateKeeper were being purchased directly in the Company, he was, in fact, instructed to wire his funds for the purchase of the shares to Ares, an entity that was, unbeknownst to plaintiff, owned by Leontakianakos himself. Then, at the direction of Leontakianakos and contrary to the PPM, defendants used the plaintiff's funds to purchase a block of shares from an unrelated third-party, rather than directly from GateKeeper.  There was, in essence, no actual private placement by GateKeeper. Rather, defendants wrongfully diverted the plaintiff's money to purchase GateKeeper shares from a third party, rather than the Company. This sort of scheme occurred, upon information and belief, multiple times and garnered Leontakianakos and Ares hundreds of thousands of dollars in the process. However, according to Leontakianakos' own sworn testimony to the SEC, once the funds paid directly to Ares for GateKeeper shares came in, Leontakianakos would then transfer to GateKeeper and CEO Wishart their cut of the money, while withholding his (Leontakianakos) own share. Email evidence between the defendants also

7

indicates that Seetoo was profiting off of this arrangement. And that he, Leontakianakos, and Gatekeeper saw no distinction between selling shares in the Private Placement and selling Ares owned shares of Gatekeeper. It was in essence all the same.

25.     On or about September 2013, when plaintiff came to suspect that defendants' claims regarding GateKeeper's business were false including the imminence of the SEC filings, he approached GateKeeper to propose a settlement to include return of the purchase price.  It was at that time that defendants disclosed to plaintiff that his purchase had not been, as he had been led to believe by defendants, from the Company, but from an unidentified third party, that the funds he had been instructed to wire to Ares had been used to purchase a block of shares from that third party, that the reason the third party had been privately selling shares in the Company was due to medical bills related to an illness, and that subsequent to the sale the (still unidentified) third-party had died.  However, records of GateKeeper's stock transfer agency, now in plaintiff's possession through subpoena, indicate that, the actual identity of the third-party seller was not, in fact, a distressed shareholder on the verge of death who had subsequently passed away, but Angelica Leontakianakos, the wife of defendant Leontakianakos, alive and well.  Mrs. Leontakianakos resides with her husband at 28 McLane Drive, Dix Hills, New York, 11746, which is, as stated above, the address of Ares.

26.     Additionally, as part of their scheme to induce unsuspecting investors such as plaintiff and others to purchase shares of GateKeeper's stock and increase market activity in its shares, defendants made to members of the investing public multiple false and inaccurate statements of material fact, which defendants knew, or were reckless in not knowing, were false and misleading.

27.     In his promotion efforts with plaintiff and associates of plaintiff, Seetoo represented that GateKeeper was a "publicly traded Homeland Security company" that had "proprietary technology for Maritime Security alert and prevention of WMD's entering into ports through shipping containers," among other applications.

28.     Contrary to Seetoo's and the Company's representation that GateKeeper is a "Homeland Security company," GateKeeper has, in fact, never entered in any agreements with the United States Government, including The Office of Homeland Security, to provide the CAMS technology to the government.

29.     Seetoo further represented that the Company was "in the midst of closing out the balance of a $10M Reg-D private placement with some institutional sized investors . . . [and that] $4M has already been Patriot Act cleared and allocated to a designated account."

30.     Seetoo and Asgard further represented through a hyperlink at the Asgard website to the website of Development Solutions that GateKeeper was in fact already "Funded $10M".

31.     Despite Seetoo's representations of the imminence of a $10 million capital influx, and statements that the funds were in whole or in part already secured to GateKeeper, no such deal or deals were ever consummated, and, upon information and belief, never even existed.

32.     Additionally, when promoting investment under the Private Placement to plaintiff and to plaintiff's colleagues, Seetoo made misleading statements and omissions regarding the public price of GateKeeper. As stated above, as an inducement to invest under "the Reg-D", Seetoo pointed to the "recent market price" of GateKeeper shares as being "$2.75 to $3.25" and the Private Placement price [ ] only $1 per share.  However, Seetoo knew at the time but did not disclose to plaintiff that the public price was being kept artificially high through the buying

activities of (among others) a Minnesota financial advisor named Howard Richards, working in concert with the defendants.

33.     In addition to Seetoo, the two controlling officers of GateKeeper, Leontakianakos and GateKeeper CEO Wishart, each had knowledge of Mr. Richards' manipulation of the market in GateKeeper shares.  Indeed, upon information and belief, Mr. Richard's manipulative buying activities were carried out under the direction of GateKeeper and Leontakianakos in his capacity as an officer of GateKeeper. Indeed, in emails to defendants Howard Richards touted his buying activities in full view of Seetoo, Leontakianakos, and GateKeeper CEO James Wishart.

34.     Also, from at least 2008 to 2012, GateKeeper made a series of false public statements, in the form of press releases at the GateKeeper website and elsewhere, written by Leontakianakos and approved and "signed off on" by GateKeeper CEO Wishart, intended to induce investors, including the plaintiff, to purchase shares of GateKeeper's stock by creating in the mind of the public and potential investors the false impression that GateKeeper was a viable business.

35.     In or about January 2008, GateKeeper issued a press release announcing that it had entered into an "exclusive" licensing and technology agreement with a company called Container Security Logistics, LLC (CSL) to produce the CAMS device for sales by GateKeeper. This agreement was referenced as well in the PPM provided to the plaintiff and in an annual report now on display at the OTC website.  In the press release, GateKeeper CEO James Wishart states that CSL has a "world class team of experts" and that CSL will "immediately" "accelerate" manufacture of the CAMS device. However, CSL does not and has never had a "team of experts" and at no time has the company had the capacity to manufacture the CAMS device, facts known to GateKeeper and its officers and agents but withheld from the plaintiff and

the public.  CSL, at the time of plaintiff's purchase and presently, had been involuntarily dissolved by the Secretary of State in Nevada, the state of its original formation, for failure to submit annual reports and pay required fees, and by the Secretary of State in Florida, where it maintained its supposed business, for substantially the same reasons, and at the time of plaintiff's purchase of GateKeeper shares was in fact defunct.  Upon information and belief, no CAMS device has been manufactured and no manufacturing facility for its production ever existed. Further, according to deposition testimony, no officer or agent of GateKeeper has ever seen or held a CAMS device.

36.     In or about September 2008, GateKeeper issued a press release at its website and elsewhere, announcing the execution of a "Blanket Purchase Order" to sell CAMS devices to a company BACO Universal Distributing, Inc. (BACO).  In the press release, GateKeeper stated that its sales to BACO could be in excess of "$300,000,000" and the first "draw down" could take place "within the next 30 days."  However, no sale of the CAMS product or any security device has been made by GateKeeper to BACO in 2008 or any other year.  Moreover, GateKeeper and its officers including Leontakianakos and Wishart were fully aware that the Company and its technology partner CSL lacked the manufacturing capacity to deliver the CAMS device let alone in sufficient numbers to meet that fantasy sales number. BACO itself at no time was in a position to make such payments, a fact of which GateKeeper and its officers were or should have been aware, before making such reckless and exaggerated public claims.

37.     The press release touting the BACO purchase order remains prominently at the GateKeeper website, although BACO is defunct in Texas, the state of its original incorporation, and in Florida where it also was organized, facts which render the original announcement materially misleading.  In essence, there was no purchase order.

38.     GateKeeper also during this period made false, exaggerated, or misleading public claims regarding its purchase of a company BioAvenge.  In or about February 2009, GateKeeper caused a press release to be disseminated at its website and elsewhere, in which GateKeeper and its officers announced the purchase of a company it identified as BioAvenge and stated that the intellectual assets acquired through that sale would be "immediately deployed to develop detection capabilities of Bio-Hazardous agents as well as establish monitoring with respect to stage of infection within individuals. These new platforms should generate significant new revenue sources for [GateKeeper] as well as expand its current product offerings to other areas related to Homeland Security and National Defense."  In that same press release, GateKeeper CEO James Wishart stated "We are very pleased with acquisition [sic]. This transaction has significantly increased shareholder value as it has added a war chest of viable assets to be utilized and exploited in the field of Homeland Security."  Yet, BioAvenge turned out to be an alias for a defunct Delaware corporation, Capital Genomix, mired in debt, including back taxes, judgments and liens, and already under the effective control of Leontakianakos and GateKeeper CEO James Wishart.

39.     Leontakianakos, Wishart, and their partners, William Hearl and Thomas August both of Maryland, prior to or immediately after the purported sale had stripped BioAvenge, upon information and belief, of any valuable assets. These assets were being concurrently marketed elsewhere by other companies unrelated to GateKeeper but still under the control of Leontakianakos and Wishart. No "immediate" deployment or development by GateKeeper of any devices or related technology occurred or has ever occurred as a result of this "acquisition" and no device or technology based on that acquisition has been "deployed in the field of Bio-Terrorism" or any other field by GateKeeper. There is no public record of the acquisition by

12

GateKeeper of "BioAvenge" or the assignment of any of its intellectual assets to GateKeeper. The issuance of the press release regarding the acquisition of BioAvenge coincided with a spike in market activity in GateKeeper shares. The contact name and phone number included in the press release are those of Leontakianakos.  The phone number of Leontakianakos is a landline located in the State of New York.  GateKeeper CEO James Wishart approved the press release for distribution from Maryland, where GateKeeper is headquartered.

40.     In or about June 2010, GateKeeper and Leontakianakos made exaggerated, misleading, and false claims, in a press release, issued through its website and elsewhere, announcing an "exclusive" investment banking engagement with Phoenix Partners LLC (Phoenix).  In the release, GateKeeper CEO James Wishart stated that Phoenix has an "impeccable reputation as does its principal []". But in fact, by 2011 Phoenix had been administratively dissolved by the California Secretary of State for failure to pay taxes and its principal, rather than having an "impeccable" reputation, had previously been convicted of bank fraud and served time in a Federal Penitentiary, facts withheld by defendants from the public and the plaintiff.  Despite the fact that agreements such as the above were ultimately terminated, no statements regarding termination of such agreements were ever disclosed on the GateKeeper website, thus rendering the original announcements materially misleading.

41.     A related announcement was made by GateKeeper at its website and elsewhere regarding a company "Smart Box Ventures" that GateKeeper claimed it had formed in partnership with an "affiliate" of Phoenix. However, that company does not exist and upon information and belief never did.

42.     These false and misleading claims about the Company and about the CAMS product extended to statements made by GateKeeper on social media sites.  As one example on

Twitter, the Company claimed that CAMS and GateKeeper offer "protection from potential terrorist attacks". Such claims at websites and on social media were intended to play directly on, and exploit, the fears and patriotism of ordinary people who are not sophisticated investors. They were a cynical calculation to draw consumers in New York, such as the plaintiff, and elsewhere into investments beyond their means as they sought to support the manufacture of a product that could, according to GateKeeper, keep their country safe from terrorist acts. Indeed, GateKeeper was marketing the Company itself as "protection" against terrorists in addition to a good investment. However, as stated above neither CAMS nor GateKeeper had any prospects and neither were in any state of development to offer anyone any protection whatsoever. Nevertheless, GateKeeper calculated their deceptive statements to have particular resonance for New York consumers who lived through the attacks of 9/11.

43.     In emails, press releases, and in promotional literature distributed to plaintiff and others, defendants knowingly represented GateKeeper as a viable company with a viable technology ready for market. In truth neither GateKeeper nor its so-called technology were viable. Defendants and their technology partners were well aware of GateKeeper's dire financial situation. CEO Wishart and the defendants took part in email discussions pertaining to the floundering Company's gloomy prospects just weeks before their decision to sell plaintiff shares at the height of the fundraising round they were promoting.

44.     Defendants failed to disclose that GateKeeper had sought out loans from shareholders to pay for OTC filings, CEO James Wishart's insurance, and other common fees. The defendants participated in and were privy to email exchanges in which the lack of capital and the lack of progress and the likelihood of failure were acknowledged and discussed openly. Nor was the fact that the costs of the SEC filings touted to plaintiff and the public as imminent

were ultimately prohibitive and beyond the Company's means, as defendants would eventually complain to plaintiff after years without any actual filings. These key financials were never disclosed to the public or the plaintiff. On the contrary optimism abounded in all public statement, press releases, and private communications with plaintiff.

45.     Nor was the retarded state of development of the CAMS device disclosed, despite the defendants' knowledge thereof. GateKeeper and its officers including Seetoo were well aware that the Company's sole marketable technology was still in an early development phase. Indeed, despite the Proof of Concept distributed by GateKeeper and the defendants to plaintiff and others, not one of them had ever seen the CAMS product in person, and were upon information and belief aware that CAMS did not in fact exist in any state, let alone in a marketable one. According to SEC testimony by Leontakianakos CAMS was not and never had been in a marketable state of development.

46.     GateKeeper and the defendants represented themselves as industry professionals with special knowledge of the financing of publically traded companies. The fact that other industry professionals who showed potential interest in financing GateKeeper complained in emails and communications delivered to the defendants that GateKeeper's model for financing was not viable and would never receive the sought after funding in its current state was never disclosed by defendants nor acted upon to remedy in any way.

47.     Indeed, while large and institutional investors were taking one look at the structure and distribution of the shares and passing on GateKeeper as a worthwhile investment before even considering the viability of the underlying CAMS technology, defendants were busy selling hundreds of thousands of shares if not more to small, private consumers in New York state and elsewhere. In short, the professionals were passing while everyday people were being

induced to purchase beyond their means whilst GateKeeper and its officers pointed to the very consideration by these institutions, which were passing on GateKeeper, as proof of the Company's imminent success.

48.     Defendants misrepresented and omitted important facts about their qualifications and backgrounds essential to making a decision about GateKeeper's viability and its officers' credibility. Leontakianakos, CFO and Head of Financing at GateKeeper, in public résumés and bios represented himself as having completed an MBA degree. In fact, MR. Leontakianakos upon information and belief has never completed an undergraduate degree in any major let alone finance. Elsewhere, Leontakianakos was busy promoting himself as a professional gambler with ties to organized crime. Seetoo represented himself as a broker and agent, omitting the fact that he had been subject to a FINRA complaint and discipline and that he was not licensed and had not been for many years.

49.     Defendants failed to disclose the circumstances surrounding the Private Placement presented to plaintiff. Specifically defendants failed to disclose that at least three Private Placements over as many years seeking the exact same amount of money for the exact same purposes of those listed in the documents given to plaintiff had taken place. And that they had apparently all failed to provide the funding necessary for marketing of the CAMS device and the liquidity of Gatekeeper's shares on the open market. They failed to disclose that tens of millions of incoming investment dollars had been reported in OTC filings but that none of those funds had, upon information and belief, ever been devoted to the production and marketing of the CAMS device as outlined in the Private Placements, or for the costs of the OTC filings themselves, for that matter. In essence the money had simply disappeared.

50.     Defendants at all times possessed the requisite scienter in that defendants at all relevant times knew or recklessly disregarded the fact that:

a.  The Company had no intention or capability of submitting the requisite SEC filings to remove the restrictions on plaintiff's shares;

b.  There were no prospects for making the Company's CAMS technology commercially viable in its current state of development;

c.  The financial information set forth in the offering documents provided to plaintiff were outdated, incomplete, and misleading;

d.  The Company had not secured private equity financing and had no prospects for doing so;

e.  Any and all money raised was diverted away from the Company and to the defendants themselves for their own use;

f.  The Company had no current or prospective contracts with the U. S. government or private shipping companies;

g.  The Market price for GateKeeper shares was the result of market manipulation and not an accurate reflection of demand for its public shares or market interest.

51.     As a result of the above false and misleading public statements and unlawful promotional activities by defendants, the market price for GateKeeper's shares was artificially inflated during the relevant time. In fact, since the time of plaintiff's investment to the present, the market price of the stock has plummeted from approximately $2.70 per share in May 2012, to the current low of $0.0001 per share

52.     Once buying by the Company and its representatives ended and GateKeeper press releases ceased being issued, the share price fell to almost zero and demand evaporated.

53.  In addition, due to the continuing Rule 144 restrictions on the sale of plaintiff's shares, his investment is worth less than even the pittance the market price itself suggests and is, in fact, completely worthless.

54.  As a result of defendants' intentional, reckless, outrageous and negligent conduct, plaintiff has been financially wiped out. Defendants' misrepresentations and omissions caused plaintiff to suffer financial damages and harm. This financial damage created a domino effect, in which plaintiff was unable to support himself, unable to support and maintain his business and career ambitions, and unable even to pay for his health insurance. Plaintiff's life and career prospects were retarded and his future earning potential was damaged. While waiting for the imminent return on his investment, and with work simultaneously becoming harder to find, plaintiff was forced to sublet his apartment, take a job in Texas for several months, where he lived hand to mouth, begging couches to sleep on from friends. His relationships with his family suffered, as they could not understand why or how plaintiff had gotten himself into this situation and why he was now approaching them hat-in-hand. As a result of the subletting of his apartment and the urgency to do so, plaintiff eventually became embroiled in a feud with his landlord which jeopardized plaintiff's rent stabilized apartment. His girlfriend and life partner at the time also elected to move out and eventually leave the relationship. Although plaintiff's apartment is now safe, his relationship with his landlord still has not fully recovered, which brings with it a whole host of complications. Plaintiff's personal life has yet to recover as well. The economics of interpersonal relationships, so salient among the underrepresented peoples of this country, has been a very heavy lesson to learn personally by plaintiff. The losses brought on by defendants' fraudulent activity continue to affect plaintiff's personal and professional life.

**<u>FIRST CAUSE OF ACTION – For Fraudulent Misrepresentations and Omissions in Violation of Section 10(b) and Rule 10b-5 of the Exchange Act (All Defendants)</u>**

55.     Plaintiff repeats and realleges paragraphs 1 through 46 of this Complaint as if fully restated herein.

56.     Defendants, from no later than June 2010 until at least May 2013, directly or indirectly, by use of the means and instrumentalities of interstate commerce and of the mails in connection with the purchase or sale of securities, knowingly, willfully or recklessly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities.

57.     Plaintiff reasonably relied on Defendants' misrepresentations and omissions. Defendants' misrepresentations caused plaintiff to suffer financial damages and harm.

58.     By reason of the foregoing, defendants, directly or indirectly, violated Section 10(b) of the Exchange Act (codified at 15 U.S.C. § 78(j)(b) and Rule 10b-5 (codified at 17 C.F.R. § 240.10b-5), for which they are liable to plaintiff for money damages.

**<u>SECOND CAUSE OF ACTION – For Fraudulent Misrepresentations and Omissions In Violation of Section 17(a) of the Securities Act (All Defendants)</u>**

59.     Plaintiff repeats and realleges paragraphs 1 through 53 of this Complaint as if fully restated herein

60.     Defendants, from no later than June 2010 until at least May 2013, directly or indirectly, in the offer or sale of securities, by the use of means or instruments of transportation or communication in interstate commerce, or of the mails: (a) obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in the light of the circumstances in which they were made,

not misleading and/or (b) engaged in transactions, practices of courses of business which operated of would operate as a fraud or deceit upon the purchasers of such securities.

61.     Plaintiff reasonably relied on defendants' misrepresentations and omissions.

62.     By reason of the foregoing, Defendants, directly and indirectly, violated Section 17(a) of the Securities Act (codified at 15 U.S.C § 77(q)) for which they are liable to plaintiff for money damages.

**THIRD CAUSE OF ACTION – For Promoter Liability in Violation of Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act (Against Asgard and Seetoo)**

63.     Plaintiff repeats and realleges paragraphs 1 through 55 of this Complaint as if fully restated herein.

64.     Defendants Seetoo and Asgard, from no later than April 2012 through May 2013 engaged in the promotion of the stock of GateKeeper.

65.     Defendants Seetoo and Asgard made material misrepresentations regarding and failed to disclose their relationship to GateKeeper and their financial interest therein at the time they promoted to plaintiff an investment in GateKeeper. As a result of plaintiff's reliance on Asgard's and Seetoo's misrepresentations and omissions, plaintiff was induced to and did purchase shares of GateKeeper, and thereby suffered financial damages and harm.

66.     By reason of the foregoing, defendants Asgard and Seetoo, directly and indirectly, violated Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act, for which they are liable to plaintiff for money damages.

**FOURTH CAUSE OF ACTION – For Negligent Misrepresentation (Against All Defendants)**

67.     Plaintiff repeats and realleges paragraphs 1 through 59 of this Complaint as if fully restated herein.

68.     As set forth above, defendants made numerous written and oral misrepresentations of material fact and failed to disclose material information to plaintiff regarding the finances and prospects of GateKeeper.

69.     Given defendants' possession of superior information and their roles as promoters of GateKeeper's stock, they had a duty to provide plaintiff information that was accurate and not misleading regarding the Company and its stock.

70.     Had plaintiff been aware of the true facts surrounding the Company and its prospects, he would not have invested his life savings in shares of GateKeeper's stock.

71.     Due to defendants' greatly superior knowledge, plaintiff's reliance on defendants' representations was justified and reasonable.

72.     As a direct result of defendants' negligence, plaintiff has suffered financial damages and harm.

### FIFTH CAUSE OF ACTION – Violation of New York General Business Law §349 (Against All Defendants)

73.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 65 of this Complaint as if fully restated herein.

74.     New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade of commerce, or in furnishing of any service in the State of New York and makes such acts and practices unlawful.

75.     As set forth above, defendants have engaged in deceptive acts and practices in New York and elsewhere in the promotion of GateKeeper and CAMS designed to create in the minds of consumers and New Yorkers such as plaintiff the illusion that GateKeeper was a viable company actively developing technologies which would keep the United States safe and that

they (the consumers) could support the development of these products and thereby their own safety through an investment in the Company itself.

76.     As a result of defendants' deceptive practices, plaintiff has suffered financial damages and harm, for which defendants are liable to plaintiff.

## DEMAND FOR RELIEF

**WHEREFORE,** plaintiff prays that this Court enter judgment against Defendants, as follows:

(a)  For compensatory judgment against defendants, jointly and severally, in the amount of $50,000; and

(b)  For punitive damages in an amount to be proved at trial, but in no event less than $250,000; and

(c)  For a reasonable attorneys' fee, in an amount to be determined at trial; and

(d)  For the costs of suit incurred herein; and

(e)  Pre- and post-judgment interest on the amounts awarded herein; and

(f)  Such further and other relief as the Court may deem just and appropriate.

Dated: New York, New York
           January __, 2018

Respectfully submitted,

By:_____
Timothy Andrew McCaffrey, *Pro Se*