UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                                           :

TIMOTHY ANDREW MCCAFFREY,      :
                                           :

                          Plaintiff,   :

                                         :           14-CV-493 (VSB)

           - against -      :

                                         :       **OPINION & ORDER**

GATEKEEPER USA, INC, ASGARD     :
INTERNATIONAL, INC, ARES VENTURES :
INC, A. JOHN LEONTAKIANAKOS, and  :
JOHN SEETOO,                :
                                         :
                        Defendants.  :
                                         :
-------------------------------------------------------X

<u>Appearances</u>:

Timothy Andrew McCaffrey
New York, New York
*Pro se*

A. John Leontakianakos
Dix Hills, New York
*Pro se*

John Seetoo
Brooklyn, New York
*Pro se*


<u>VERNON S. BRODERICK, United States District Judge</u>:

        Pro se Plaintiff Timothy Andrew McCaffrey ("Plaintiff" or "McCaffrey") brought suit

alleging various forms of securities fraud and negligent misrepresentation against Defendants

Gatekeeper USA, Inc. ("Gatekeeper"), Asgard International, Inc. ("Asgard"), Ares Ventures Inc.

("Ares," and together with Gatekeeper and Asgard, the "Entity Defendants"), as well as against

two individuals, Defendants A. John Leontakianakos ("Leontakianakos") and John Seetoo

("Seetoo," and together with Leontakianakos, the "Individual Defendants").[1]   Now before me is

McCaffrey's motion for summary judgment against the Individual Defendants.  For the reasons

that follow, McCaffrey's motion for summary judgment is GRANTED.

## I.   Background

In the first half of 2012, McCaffrey was introduced to Seetoo.  (Pl. 56.1 ¶ 2.)[2]  In an

email dated March 31, 2012, Seetoo wrote to McCaffrey that he had "been working on" a "very

important Homeland Security deal" and was "in the final stages of closing on a $10M Private

Placement for" Gatekeeper.  (*Id.*; Pl. Ex. B, at 1.)[3]  Seetoo also wrote that, although Gatekeeper's

stock had been trading at a "recent market price [of] $2.75-$3.25," McCaffrey could buy

Gatekeeper stock through "the Private Placement . . . at $1" per share.  (Pl. 56.1 ¶ 4.)[4]  Seetoo

stated that Gatekeeper's "stock will become free trading once the Private Placement is closed and

---

[1] Despite having been previously represented by counsel in this action, the Individual Defendants are now
proceeding pro se.  After defense counsel was relieved, McCaffrey moved for default judgments against the Entity
Defendants, and I granted defaults against the Entity Defendants on the issue of liability on December 13, 2018.
(Doc. 232.)

[2] "Pl. 56.1" refers to Plaintiff's Statement of Fact Pursuant to Local Rule 56.1.  (Doc. 252-1.)  Unless otherwise
indicated, the facts asserted by Plaintiff and referenced herein are undisputed or expressly conceded by Defendants.

Although the Individual Defendants purport to "dispute" many of the facts within Plaintiff's Local Rule 56.1
statement, these disputes are mostly not about the facts themselves, but rather take issue with the implications or
characterizations of those facts.  Moreover, the Individual Defendants' account of the facts in this action are made
without reference to evidence, but are instead unsubstantiated conjecture, characterizations, and argumentation.
These actions are improper under Local Rule 56.1, and I disregard Plaintiff's improper assertions.  *See LG Capital
Funding, LLC v. PositiveID Corp.*, No. 17-CV-1297-NGG-SJB, 2019 WL 3437973, at *2 (E.D.N.Y. July 29,
2019) ("The Court can disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement."
(internal quotation marks omitted)); *Crump v. Fluid Handling, LLC.*, No. 17-CV-45, 2019 WL 2145929, at *2
(W.D.N.Y. Mar. 29, 2019) ("Rather than scrutinize a Rule 56.1 statement line by line, a court may simply disregard
any improper assertions or inadmissible evidence.").  Here, the pro se status of the Individual Defendants does not
shield them from the repercussions of their actions because "a pro se party's bald assertions unsupported by
evidence are insufficient to overcome a motion for summary judgment."  *Parker v. Fantasia*, 425 F. Supp. 3d 171,
183–84 (S.D.N.Y. 2019) (internal quotation marks omitted).

[3] "Pl. Ex." refers to the exhibits contained in the document titled Plaintiff's Appendix in Support of Motion for
Summary Judgment.  (Doc. 273.)

[4] In an April 5, 2012 email, Seetoo wrote to McCaffrey to say that, in addition to any personal investment in
Gatekeeper McCaffrey may make, Seetoo would compensate McCaffrey for anyone McCaffrey got to invest in
Gatekeeper.  (Pl. 56.1 ¶ 5 & Pl. Ex. B, at 10.)

the audits are made current for an S-1 filing, which will grandfather in all of the" stock sold in private placements, such that those Gatekeeper shares could be purchased by "financial houses" such as "UBS" for "their institutional clients." (Pl. Ex. B, at 1.)

Seetoo wrote that Gatekeeper had developed a product "called CAMS (Container Automated Monitoring System)," which "involves proprietary technology that was used on the Viking Mars Lander Probe," and which "can detect and alert for temperature changes and the presence of contaminants." (*Id.*) Seetoo elaborated that Gatekeeper's business prospects with CAMS included "both the counter-terrorism security front as well as the insurance arena and even the interdiction of Human Trafficking," and that Gatekeeper's "CAMS devices" had various "additional benefits" that made them attractive to prospective buyers. (*Id.*) Seetoo said he had "known the people behind [CAMS] for going on 20 years." (*Id.*)

Despite Seetoo's representations, however, Gatekeeper never completed development of any CAMS devices or began "manufacturing any products." (Pl. Ex. G, at 10.) In a deposition taken in 2015 as part of an SEC investigation into Gatekeeper, Leontakianakos explained that Gatekeeper had licensed "intellectual property" from a separate company, known as "CSL," and entered into "a development agreement" under which CSL would "develop the actual device that [Gatekeeper] would" sell. (*Id.* at 9.) CSL only "developed" a prototype "up to a certain point," and never to the point that Gatekeeper was able to "sell any products." (*Id.* at 10.) Gatekeeper never developed an actual CAMS device that could serve as a marketable product. (Pl. 56.1 ¶ 65.)

Despite this, Gatekeeper had issued various public statement suggesting that it had CAMS devices ready for sale. (*See id.* ¶ 53.) For example, in a press release from Gatekeeper dated September 5, 2008, Gatekeeper announced it had entered into a "Blanket Purchase Order"

with another company, known as "BACO," under which it "estimate[d] that sales" of CAMS

devices to BACO may "exceed $300,000,000." The press release also states that BACO "ha[d]

chosen three different models of 'CAMS' device," and that Gatekeeper "anticipated" receiving

its first order under the Blanket Purchase Order "within the next thirty days." (Pl. Ex. F, at 9.)[5]

This deal—to the extent it ever actually existed—never resulted in any purchases, as Gatekeeper

never "manufactur[ed] any products" or had any "revenues." (Pl. Ex. G, at 10.) Gatekeeper's

CEO disclaimed knowledge of BACO or Gatekeeper's dealing with BACO, saying that it may

have been "Seetoo or . . . Leontakianakos" who "did the introduction" between the companies.

(Pl. 56.1 ¶ 58 & Pl. Ex. G, at 141.)

In addition, "[f]rom January 2010 through July 2013," unbeknownst to McCaffrey, non-

party Howard Richards ("Richards") "engaged in a manipulative scheme to support the market

price of the common stock of Gatekeeper." *Howard Richards*, Exchange Act Release No.

76058, Investment Advisers Act Release No. 4212, Investment Company Act Release No.

31854, 2015 WL 5729488, at *1 (Sept. 30, 2015).[6] Richards is an associate of the Individual

Defendants—he sent Leontakianakos and Seetoo multiple emails in 2012 about "limit orders"

and other market orders he placed for Gatekeeper stock. (Pl. 56.1 ¶ 7 & Pl. Ex. C, at 4–6.) In a

chain of emails on April 22 and 23, 2012, Seetoo wrote to Richards, "my Scottrade account is

showing last trade 2.75, no bid or offer at present," and Richards replied to Seetoo and

Leontakianakos writing, "Got it fixed at schwab. Whew!" (Pl. Ex. C, at 14–15.)

---

[5] (*See also* Pl. Ex. F at 43–45 (collecting Gatekeeper's now-deleted tweets of press releases bearing titles including "GateKeeper USA's CAMS Devices Defines the Paradigm for Advanced Container Security Devices" and "GateKeeper USA, Inc. launches new product to address maritime piracy").)

[6] McCaffrey also included a copy of this SEC adjudication in the exhibits supporting his motion for summary judgment. (Pl. Ex. G, at 108.)

In its order dated September 30, 2015, the SEC found that "Richards caused his clients to invest over $1 million in shares of Gatekeeper stock" between "January 2010 and July 2013," and that Richards timed orders for Gatekeeper stock whenever the stock's "price fell below a certain level."  2015 WL 5729488, at *1.  The SEC "barred" Richards from various broker and investment advisor activities and ordered him to pay disgorgement and penalties totaling $144,000.  *Id.* at *6.

On April 11, 2012, Seetoo emailed McCaffrey a stock transfer agreement and instructions for how to wire funds to purchase Gatekeeper stock.  (Pl. 56.1 ¶ 24; Pl. Ex. B, at 14–15.)  In a series of emails, Seetoo explained to McCaffrey that his purchase of Gatekeeper stock would be handled through Ares.  (Pl. 56.1 ¶ 18.)  Ares, a New York company, (*id.* ¶ 29), was owned by Leontakianakos, (*id.* ¶ 27), and Leontakianakos "personally generated the Ares stock transfer agreement" that Plaintiff ultimately signed, (*id.* ¶ 30).  Leontakianakos had a business relationship with Seetoo under which Seetoo "introduce[d] [Gatekeeper] to institutional investors" as well as "individual investors who bought shares [in Gatekeeper] from [Leontakianakos]."  (Pl. Ex. G, at 15.)  Seetoo was "paid" for his services.  (*Id.* at 16.)

In the course of their emails, Seetoo sent McCaffrey various documents about Gatekeeper's prospects, including business plans, financial information, promotional materials, and a private placement memorandum.  (*Id.* ¶¶ 19–20.)  On May 2, 2012, Seetoo wrote to McCaffrey to say that he was scheduled to have "a conference call tomorrow afternoon with [an] institutional investor who's slated to take in excess of 6M [Gatekeeper] share[s]," and that "things are proceeding according to plan."  (Pl. Ex. B, at 20.)

"Relying on Seetoo's assurances and on the accuracy of the materials presented to him, [P]laintiff signed the stock transfer agreement and wired $50,000 to Ares."  (Pl. 56.1 ¶ 25.)

"Leontakianakos personally generated the Ares stock transfer agreement" that was used for McCaffrey's purchase of Gatekeeper stock.  (Pl. 56.1 ¶ 30; Doc. 282, at 9 (Individual Defendants' response stating "No opposition" to this).)  McCaffrey made his wire transfer of "$50,000 on May 30, 2012," and Leontakianakos "sp[oke] to him about acquiring" Gatekeeper shares prior to McCaffrey's purchase.  (Pl. Ex. G, at 18.)  However, the shares McCaffrey received did not come from Ares or Gatekeeper.  Rather, when Ares entered into "transactions [for] sales of shares," those transactions were "a reselling of shares that came from either [Leontakianakos] or" members of Leontakianakos' family, "not from Gatekeeper itself."  (*Id.* at 16.)

Around the same time that McCaffrey purchased shares of Gatekeeper stock, again unbeknownst to McCaffrey, Gatekeeper was struggling to find the financing it needed to proceed with an S-1 registration.  (Pl. 56.1 ¶ 40.)  For example, on July 11, 2012, Leontakianakos and Gatekeeper's CEO exchanged emails regarding how they needed "to make an immediate change to better position the company for the current market environment and to address some of the obstacles we are facing from a funding [sic] prospective."  (Pl. Ex. C, at 21.)

On July 25, 2012, McCaffrey sent Seetoo an email asking "when are these shares gonna be tradeable," and stating that Seetoo had promised they would be tradeable in the "first week of [J]une" of 2012.  (Pl. Ex. B, at 27.)  In an email dated September 12, 2012, Seetoo wrote to McCaffrey to say that he expected that Gatekeeper would "complete[] this month" what it needed to do both "to start manufacturing" CAMS and to finalize its "S-1 filing" with the SEC. (Pl. Ex. B, at 29.)  Seetoo wrote that once "the S-1 registration becomes effective, your shares will be cleared as free trading."  (*Id.*)

On August 21, 2012, Seetoo wrote to McCaffrey that Gatekeeper had recently "sign[ed]" with a financial firm for help with an "equity raise and [Gatekeeper's]" still-to-be-finalized "NASDAQ listing." (*Id.* at 31.)

In April and May of 2013, McCaffrey's mother, Jackie, and Seetoo exchanged emails in which Jackie urged Seetoo to buy back some of the Gatekeeper stock McCaffrey had purchased. (*Id.* at 34–37.) In June of 2013, McCaffrey and Seetoo exchanged contentious emails in which McCaffrey demanded payment and Seetoo rejected his demand, saying that the amount McCaffrey demanded would have been a "250% premium" over what McCaffrey paid. (Doc. 282, at 25–26.)[7]

According to the SEC's investigation of Richards, Gatekeeper was "not successful and did not receive any financing" and never managed to "develop, manufacture and sell the CAMS device." 2015 WL 5729488, at *3. (*See also* Pl. 56.1 ¶ 65 ("CAMS was not and never had been in a marketable state of development.").) Publicly available information shows that Gatekeeper's stock price has been quoted at or near $0.00 since mid-2016. GATEKEEPER USA INC (GTKP) STOCK PRICE, The Motley Fool, https://www.fool.com/quote/otc/gtkp/#InteractiveChart (last visited March 23, 2022).[8]

## II.   **Relevant Procedural History**

Plaintiff commenced this action on January 27, 2014. (Doc. 1.) On March 25, 2015, I denied Defendants' motion to dismiss. (Doc. 100.) On January 26, 2018, Plaintiff filed his First Amended Complaint. (Doc. 203 ("FAC").) On December 13, 2018, I entered defaults against Defendants Gatekeeper, Asgard, and Ares on the issue of liability, and I held in abeyance an

---

[7] The parties did not file the full chain of emails that were part of this exchange.

[8] I may properly consider publicly available material such as this. *See* FRE 201.

inquest on damages pending resolution of McCaffrey's claims against the Individual Defendants. (Doc. 232.)

On August 27, 2019, Plaintiff filed the instant motion for summary judgment (the "Motion"). (Doc. 252.) After a variety of filings in which the Individual Defendants contended they had not received service of the Motion, I authorized Plaintiff to serve Leontakianakos by email and Seetoo by mail. (Doc. 259.)[9] On February 24, 2020, the Individual Defendants filed their papers in opposition to the Motion. (Doc. 282.) On April 3, 2020, Plaintiff filed his reply brief on the Motion. (Doc. 289.)

### III.   Legal Standard

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

---

[9] Throughout this action, Defendants have raised various objections to service of process. For example, on March 25, 2015, I entered a Memorandum and Order in which I denied a motion to dismiss for lack of sufficient service. (Doc. 100.) This Memorandum and Order was premised on findings I had made during a February 25, 2015 conference. (*Id.* at 2.) At the February 25, 2015 conference, I found, among other things, that a process server's affidavit of service "was more than credible and that service was properly effected upon . . . Leontakianakos," and that "I do not credit . . . Leontakianakos's testimony" because he did "not provide[] any proof to counter the compelling documentary evidence" of proper service. (Doc. 98, at 11:2–3, 14–16.) I also found that "the president/CEO of Gatekeeper" had "submitted two conflicting affidavits to this Court regarding" facts critical to whether service on Gatekeeper had been proper. (*See id.* at 14:5–9; *see also id.* at 14:13–14 ("Mr. Wishart's affidavit of May 4, 2014 appears to have been notarized at an earlier occasion, March 14, 2014.").) Regardless of Defendants' asserted past purported issues with service, there should be no further issue with service in this action, since after McCaffrey filed his Motion and served it on Defendants, the Individual Defendants managed to file their opposition, which bears both of their signatures. (Doc. 282, at 2.)

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3).

In considering a summary judgment motion, the Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citation and quotation marks omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude should be afforded pro se litigants." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001), and a court should construe "the submissions of a pro se litigant . . . liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (emphasis and quotation marks omitted).  Moreover, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should . . . be[ ]made in light of the opposing party's *pro se* status").  "Nonetheless, proceeding *pro se* does not otherwise relieve a litigant of the usual requirements of summary judgment, and a *pro se* party's bald assertions unsupported by evidence . . . are insufficient to overcome a motion for summary judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (internal quotation marks omitted); *accord Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017).

**IV.   <u>Discussion</u>**

In his operative pleadings, Plaintiff asserted five causes of action—one for violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5; two for violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q; one for negligent misrepresentation; and one for violation of New York's General Business Law § 349—all of which seek, among other things, compensatory damages arising from Plaintiff's payment of

$50,000 for 50,000 shares of Gatekeeper stock.  (*See generally* FAC.)[10]

I begin by analyzing whether Plaintiff is entitled to summary judgment on his claim against the Individual Defendants for negligent misrepresentation.  Because each of his causes of action are premised on "the same injury," *EMA Fin., LLC v. Joey New York Inc.*, 17-CV-9706 (VSB), 2022 WL 292920, at *13 (S.D.N.Y. Feb. 1, 2022) (quoting *Indu Craft v. Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1995)), and since I find that Plaintiff is entitled to recovery on this claim, I will not analyze his other claims.  *See Martilet Mgmt. Servs., Inc. v. Bailey*, No. 12 Civ. 6691(PAC), 2013 WL 5420966, at *5 (S.D.N.Y. Sept. 27, 2013) (finding that "[t]he Court need not address" plaintiff's fraud claim "because Plaintiff has prevailed on its contract claim for the same relief.").

### A.  *Negligent Misrepresentation*

#### 1.  **Applicable Law**

Under New York law, "a claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information."  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011) (quoting *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007)); *see also Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 788 (2d Cir. 2003) ("It is settled New York law that the elements of negligent misrepresentation are:  (1) carelessness in imparting words; (2) upon which others were expected to rely; (3) and upon which they did act or failed to act; (4) to their damage . . . [and] that (5) the declarant must express the words directly, with knowledge or notice that they will be acted upon, to one to whom the declarant is

---

[10] "FAC" refers to the First Amended Complaint.  (Doc. 203.)

bound by some relation or duty of care." (internal citation omitted)).

On the element of duty, "[t]he touchstone of the inquiry is . . . some link of the 'defendant to plaintiff which evinces defendant's understanding of plaintiff's reliance.'" *Huang v. Sentinel Gov't Sec.*, 709 F. Supp. 1290, 1298 (S.D.N.Y. 1989) (quoting *Eiseman v. State,* 70 N.Y.2d 175, 188 (1987)). Duty may be demonstrated in a number of ways. One way is when there is "actual privity of contract between the parties or a relationship so close as to approach that of privity." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012) (internal quotation marks omitted). A relationship approaching privity exists where a plaintiff can prove "(1) the defendant had awareness that its work was to be used for a particular purpose; (2) there was reliance by a third party known to the defendant in furtherance of that purpose; and (3) there existed some conduct by the defendant linking it to that known third party evincing the defendant's understanding of the third party's reliance." *Fin. Gaur. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405–06 (2d Cir. 2015) (internal quotation marks omitted). Another way the duty can be satisfied is where there is "direct communication between" the plaintiff and defendant showing defendant's "intent to . . . influence plaintiff[] to" complete a "purchase." *See Anschutz Corp.*, 690 F.3d at 115 (internal quotation marks omitted). Further, a "duty to disclose" can arise "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge, or . . . where a party to a business transaction has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth." *See Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 201 (S.D.N.Y. 2011) (Sullivan, J.).

To be liable for negligent misrepresentation, a defendant need not make "an affirmative

misrepresentation;" a defendant need only "breach[] a duty to provide a plaintiff with accurate information." *Abu Dhabi Com. Bank v. Morgan Stanley & Co. Inc.*, 910 F. Supp. 2d 543, 546 (S.D.N.Y. 2012) (citing *Mandarin Trading*, 16 N.Y.3d at 180); *see also Eiseman*, 70 N.Y.2d at 187 ("Liability in negligence may of course rest on some form of written misrepresentation or nondisclosure on the part of defendant by which plaintiff or a third party is misled . . . where there is a duty to give the correct information."); *Basso v. New York Univ.*, 16-CV-7295 (VM) (KNF), 2018 WL 2694430, at *3 (S.D.N.Y. June 5, 2018) ("[N]egligent misrepresentation includes misrepresentation by failure to impart information." (citing *J.A.O. Acquisition Corp.*, 8 N.Y.3d at 148)); *In re Leslie Fay Cos. Sec. Litig.*, 918 F. Supp. 749, 768 (S.D.N.Y. 1996) ("The gist of the action is fraudulently producing a false impression upon the mind of the other party . . . . [I]t is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of plaintiff." (quoting *Noved Realty Corp. v. A.A.P. Co.*, 293 N.Y.S. 336, 341 (1st Dep't 1937))). However, "[w]here a plaintiff is notified that the information it possesses is incomplete, or is subject to information contained elsewhere, the plaintiff may truly be said to have willingly assumed the business risk that the facts may not be as represented." *M & T Bank Corp. v. LaSalle Bank Nat. Ass'n*, 852 F. Supp. 2d 324, 339 (W.D.N.Y. 2012) (internal quotation marks omitted); *see also Rodas v. Manitaras*, 552 N.Y.S.2d 618, 620 (1st Dep't 1990) ("[W]here . . . a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented.").[11]

---

[11] The New York Court of Appeals has further clarified that "[w]here . . . a plaintiff has taken reasonable steps to

The question of reasonable reliance "is generally left to a finder of fact." *Talansky v. Schulman*, 770 N.Y.S.2d 48, 54 (1st Dep't 2003); *see also Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997) ("The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive.").  However, a plaintiff's "reliance on the representations of" a defendant, without further investigation, may be found to be reasonable at the summary judgment stage where the plaintiff relies on information "peculiarly within the defendant's knowledge." *Charney v. Zimbalist*, No. 07 Civ. 6272(AKH)(GWG), 2015 WL 4597538, at *4 (S.D.N.Y. July 30, 2015), *aff'd sub nom. Charney v. Wilkov*, 734 F. App'x 6 (2d Cir. 2018) (citing *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006)).

### 2.   Application

#### a.   Duty

The undisputed record establishes that the Individual Defendants each individually owed McCaffrey the requisite duty "to impart correct information." *Mandarin Trading*, 16 N.Y.3d at 180.  Seeto and Leontakianakos "direct[ly] communicat[ed]" with McCaffrey and provided him with various representations about Gatekeeper, thereby demonstrating their "intent to . . . influence" McCaffrey's decision to buy Gatekeeper stock.  *See Anschutz Corp.*, 690 F.3d at 115. Seetoo's initial emails presented Gatekeeper as a bargain by saying that McCaffrey could buy the shares for "$1" apiece even though they were carrying a "market price [of] $2.75-$3.25."  (Pl. 56.1 ¶ 4.)  Seetoo also touted the various ways in which Gatekeeper made for a promising investment, (Pl. Ex. B, at 1), and sent McCaffrey the stock transfer agreement and wiring

---

protect itself against deception, it should not be denied recovery merely because hindsight suggests that it might have been possible to detect the fraud when it occurred.  In particular, where a plaintiff has gone to the trouble to insist on a written representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry."  *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 15 N.Y.3d 147, 154 (2010).

instructions to complete the purchase, (Pl. 56.1 ¶ 24; Pl. Ex. B, at 14–15).  Similarly, Leontakianakos confirmed that he "sp[oke] to [McCaffrey] . . . about acquiring Gatekeeper shares."  (Pl. Ex. G, at 18.)  "Leontakianakos personally generated the Ares stock transfer agreement" that was provided to McCaffrey for him to buy Gateekeeper stock.  (Pl. 56.1 ¶ 30.)

Moreover, even without his own direct communications with McCaffrey, Leontakianakos' duty arises because the record shows that Seetoo was Leontakianakos' agent with the responsibility of soliciting buyers of Gatekeeper stock from Ares.  *See Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 130 (2d Cir. 2003) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." (quoting Restatement (Second) of Agency § 1 (1958))).  In his deposition before the SEC, Leontakianakos testified that he "paid" Seetoo for finding "individual investors who bought shares [in Gatekeeper] from [Leontakianakos]."  (Pl. Ex. G, at 15.)  As mentioned, the stock transfer agreement that Seetoo emailed to McCaffrey was "personally generated" by Leontakianakos, (Pl. 56.1 ¶ 30), and Leontakianakos "assisted with" the drafting of a Gatekeeper "business plan" provided to prospective investors, (Pl. Ex. G, at 58).  This suggests an agency relationship— Seetoo solicited McCaffrey's investment, for Leontakianakos' investment, using materials Leontakianakos created expressly for this sort of solicitation.  As such, Seetoo's "acts and knowledge," as Leontakianakos' "agent . . . are imputed to" Leontakianakos.  *In re Mediators, Inc.*, 105 F.3d 822, 827 (2d Cir. 1997) (citing *Center v. Hampton Affiliates, Inc.*, 66 N.Y.2d 782, 784 (1985)).  This includes Seetoo's "direct communication" with McCaffrey.  *Anschutz Corp.*, 690 F.3d at 115.

Further, Leontakianakos' duty is established because the record demonstrates that he was

in "actual privity of contract" with McCaffrey.  *Id.* at 114.  When Ares received wire transfers

for purchases of Gatekeeper stock, the stock actually transferred to the buyer "came from either

[Leontakianakos] or" one of his family members, not from Ares itself.  (*See* Pl. Ex. G, at 12–15,

17–18 (identifying transferors of shares as including Leontakianakos, as well as his "spouse,"

Angelica Leontakianakos).)  In the case of McCaffrey's purchase, once Ares received

McCaffrey's $50,000 wire transfer, Leontakianakos caused the transfer of 50,000 shares of

Gatekeeper stock that had been held in the name of his spouse.  (Pl. Ex. G, at 18; Pl. Ex. M, at

97.)  Moreover, the Individual Defendants concede that the $50,000 McCaffrey "wired to Ares

was spent by Leontakianakos for his personal use."  (Doc. 282, at 9.)   In other words,

Leontakianakos and McCaffrey were "counterpart[ies]" because they stood in "contractual

privity."  *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 483

(S.D.N.Y. 2014).[12]

---

[12] In light of the "special solicitude" afforded to "pro se litigant[s]" like Individual Defendants, *Lewinski*, 848 F.2d at 344, I have considered the potential argument, not raised by the parties, that Ares, and not Leontakianakos, was the only counterparty to the transaction with McCaffrey, and thus that McCaffrey cannot recover against Leontakianakos directly.  However, this argument cannot insulate Leontakianakos from liability.  "A corporate owner or officer may be held individually liable for a tort committed by the corporation if he participates in the commission of the tort."  *Am. Lecithin Co. v. Rehmann*, 12-CV-929 (VSB), 2020 WL 4260989, at *6 (S.D.N.Y. July 24, 2020) (internal quotation marks omitted) (collecting cases).  Here, the undisputed record shows that Leontakianakos was at all relevant times Ares' owner, (*see, e.g.*, Pl. Ex. G, at 8); that "Leontakianakos personally generated the Ares stock transfer agreement," (Pl. 56.1 ¶ 30); and that Leontakianakos "sp[oke] to [McCaffrey] about acquiring . . . Gatekeeper shares," (Pl. Ex. G, at 18).  This establishes personal participation.  Thus, even if Ares were the only counterparty, Leontakianakos would still be liable without any need for "piercing the [corporate] veil" due to his "personal[] participat[ion]."  *See Am. Lecithin*, 2020 WL 4260989, at *6 n.12 (citing *Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 522 (S.D.N.Y. 2016)).

Moreover—and although it is not necessary to my holding—it is very likely that veil-piercing would apply here and render Leontakianakos directly liable to McCaffrey for Ares's liability to McCaffrey.  Under New York law, which applies as Ares was "organized in New York," (Pl. 56.1 ¶ 29), "piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *LiquidX Inc. v. Brooklawn Cap., LLC*, 254 F. Supp. 3d 609, 616 (S.D.N.Y. 2017) (quoting *Morris v. N.Y.S. Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 141 (1993)).  "[C]omplete domination of the corporation" can be shown where "the owners use[d] the corporation as a mere device to further their personal rather than the corporate business." *Morris*, 82 N.Y.2d at 141.  "Leontakianakos has used proceeds from sales of Gatekeeper shares by Ares for . . . his personal use," (Pl. 56.1 ¶ 35), and the record shows that, when Ares received orders for Gatekeeper stock, the shares it transferred came "from either [Leontakianakos] or" members of Leontakianakos' family, (Pl. Ex. G, at 16).

Accordingly, I find that there is no genuine issue as to any material fact regarding the Individual Defendants' duty to supply McCaffrey with accurate information regarding Gatekeeper and its CAMS device.

### b.  Incorrect Information

The undisputed facts show that, in spite of their "duty to give the correct information," the Individuals Defendants made at least two types of "misrepresentation[s] or nondisclosure[s]" by which McCaffrey was "misled."  *Eiseman*, 70 N.Y.2d at 187.

First, the Individual Defendants presented McCaffrey with materials that discussed the supposed CAMS device as if it were an existing, marketable product.  (*See, e.g.*, Pl. Ex. A, at 16 (Gatekeeper private placement memorandum stating that Gatekeeper "intends to sell and market its proprietary shipping container security device known as . . . CAMS"), at 26 (depicting a device captioned as "CAMS" and stating "[w]hile CAMS is, and may appear to be a premium device, it is configured for ***quick payback on the customer's ROI*** and will become the standard in the future," and concluding "[i]n summary, our Gatekeeper CAMS is an affordable, multi-purpose security device"); Pl. Ex. E, at 34 (same); Pl. Ex. B, at 1 ("The company's CAMS devices not only cut through the problems experienced in the current program, but have multiple additional benefits").)  Indeed, the Individual Defendants concede that "Plaintiff was told" that Gatekeeper was seeking capital to begin "large scale production of a device called CAMS." (Doc. 282, at 6.)  Contrary to these statements, the CAMS device "was not and never had been in a marketable state of development," (Pl. 56.1 ¶ 65), and Gatekeeper never began "manufacturing

---

Leontakianakos also conceded in a deposition that "Ares helped [him] in [his] function for Gatekeeper" and was not fulfilling any corporate purpose "in addition" to that.  (*Id.* at 8.)  *Cf. Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 138 (2d Cir. 1991) ("The critical question is whether the corporation is a shell being used by the individual shareowners to advance their own purely personal rather than corporate ends."  (internal quotation marks omitted)).

any products." (Pl. Ex. G, at 10.)   The Individual Defendants maintained their representation

that CAMS was an already-extant "device" in the information memorandum attached to the

stock transfer agreement that governed McCaffrey's purchase of Gatekeeper stock. (Pl. Ex. E, at

34; *see also* Doc. 282, at 8–9 (conceding that Seetoo provided the stock transfer agreement and

that Leontakianakos "personally generated the . . . stock transfer agreement").)   The Individual

Defendants made these representations despite their knowledge that the CAMS device did not

yet exist and had not yet been developed to a degree that it could be sold. (Pl. Ex. G, at 10

(Leontakianakos deposition testimony that the device had not been "developed" to a point that it

could "manufactur[e] any products"), 196–97 (Seetoo deposition testimony that he had never

"seen a CAMS device in person" or seen "a completed [CAMS] device" in any form).)

Second, the undisputed record shows that both Individual Defendants were aware of

Richards' trading activities, which were aimed at keeping Gatekeeper's stock price artificially

high. (Pl. 56.1 ¶¶ 7–8; Pl. Ex. M, at 111 (SEC order against Richards explaining how Richards

carried out his market orders to prop up Gatekeeper's stock price); Pl. Ex. C, at 4–6, 14 (emails

among Richards, Leontakianakos, and Seetoo regarding Richards' Gatekeeper stock trading

activity).)   Although not necessary to my decision, an inference can be drawn based on the

record before me that the Individual Defendants and Richards planned for Richards' stock

trading to artificially inflate the stock price to facilitate Individual Defendants' efforts to sell

Gatekeeper stock to individuals like McCaffery.

The record also shows that Seetoo represented to McCaffrey that "the recent market

price" for Gatekeeper stock around the time of McCaffrey's purchase was "$2.75-$3.75," (Pl.

56.1 ¶ 4), and that McCaffrey relied on "the accuracy" of this figure, as well as the accuracy of

the various "materials presented to him," when he "wired $50,000" to Leontakiankos' entity,

Ares, to purchase Gatekeeper stock, (*id.* ¶ 25).

Accordingly, on the undisputed facts before me, there is no genuine issue as to any material fact that the Individual Defendants failed to supply "accurate information" regarding the state of CAMS and the true nature of Gatekeeper's stock price to McCaffrey.  *See Abu Dhabi Com. Bank*, 910 F. Supp. 2d at 546; *Eiseman*, 70 N.Y.2d at 187; *see also Kimmel v. Schaefer*, 89 N.Y.2d 257, 261–62 (1996) (affirming liability for negligent misrepresentation where defendant, a company insider, solicited investments and provided financial projections that failed to account for a utility rate structure that rendered the project economically impractical).  As such, I must find that the Individual Defendants breached their duty to McCaffrey.

### c.  Reasonable Reliance

The Individual Defendants expressly concede that McCaffrey was "[r]elying on Seetoo's assurances and on the accuracy of the materials presented to him" when he "signed the stock transfer agreement and wired $50,000" to buy Gatekeeper stock.  (Doc. 282, at 8–9.) Accordingly, to the extent that anything McCaffrey relied upon was incorrect, and to the extent that the correct information was "peculiarly within" the Individual Defendants' knowledge, McCaffrey's reliance will be deemed reasonable, regardless of whether McCaffrey conducted his own investigation.  *See Crigger*, 443 F.3d at 234.

Here, the undisputed facts show that the operative misrepresentations and omissions mentioned *supra* were peculiarly within the Individual Defendants' knowledge.  Both Individual Defendants were included in email communications with Richards regarding Richards' trading activity aimed at propping up Gatekeeper's stock price, (Pl. Ex. C, at 4–6, 14 (emails among Richards, Leontakianakos, and Seetoo regarding Richards' Gatekeeper stock trading activity)), and both Individual Defendants were aware that Gatekeeper had not produced a marketable

CAMS device, (Pl. Ex. G, at 10, 196–97). The Individual Defendants have not submitted any evidence demonstrating that there was any way for McCaffrey to know of either the true state of the CAMS device or that their representations regarding the "market price" of Gatekeeper stock at the time of McCaffrey's purchase, (*e.g.*, Pl. Ex. B, at 1), was premised on fraudulent activity known to them. Accordingly, I find that there is no genuine issue as to any material fact regarding McCaffrey's reliance and that I must find McCaffrey's reliance was reasonable.

### B. *Relief to Be Awarded*

A district court determining a summary judgment motion may award damages and other relief when there is no dispute of material fact as to that relief. Fed R. Civ. P. 56(a); *see, e.g.*, *Alpha Cap. Anstalt v. Shiftpixy, Inc.*, 432 F. Supp. 3d 326, 331 (S.D.N.Y. 2020) (adopting report and recommendation on summary judgment and granting a damages remedy of $500,000 where defendant did "not contest . . . [p]laintiff's calculation of $500,000 in damages"); *First Data Merch. Servs. Corp. v. Oxford Mgmt. Servs., Inc.*, No. 07–CV–2083 (RRM)(ETB), 2013 WL 5460647, at *2 (E.D.N.Y. Sept. 27, 2013) (awarding summary judgment as to damages "[i]n light of the undisputed evidence of damages").

Here, Plaintiff asserted five causes of action and sought the same relief for each. "[A] plaintiff seeking compensation for the same injury under different legal theories is of course only entitled to one recovery." *EMA Fin.*, 2022 WL 292920, at *13 (quoting *Indu Craft*, 47 F.3d at 497). "In fraud cases, including for negligent misrepresentation, New York law follows the 'out of pocket rule' that limits damages to the actual pecuniary loss sustained as the direct result of the wrong." *PBR Sales, LLC v. Liberty Petroleum Trading Int'l, LLC*, 18 Civ. 11639 (PMH) (PED), 2020 WL 4353237, at *5 (S.D.N.Y. June 22, 2020) (some internal quotation marks omitted) (collecting cases), *report and recommendation adopted*, 18-cv-11639 (PMH), 2020 WL

4349992 (S.D.N.Y. July 29, 2020).  In this case, there is no dispute of material fact as to the

amount of McCaffrey's loss as a result of Defendants' negligent misrepresentation:  the $50,000

he expended for Gatekeeper stock in reliance upon the Individual Defendants' representations.

Accordingly, McCaffrey will be awarded $50,000 in compensatory damages.

On this $50,000 amount, McCaffrey is entitled to prejudgment interest as required by

governing New York law.  *Mollis v. Bankers Trust Co.*, 717 F.2d 683, 692 n.23 (2d Cir. 1983)

("[S]tate law applies to questions of prejudgment interest on the pendent claims in an action

predicated upon violations of the federal securities laws.").  Under New York law, "interest shall

be computed from the earliest ascertainable date the cause of action existed."  N.Y. C.P.L.R. §

5001(b).  Because a negligent misrepresentation claim accrues at the time that a defendant's

negligent misrepresentation causes a plaintiff to part with his money, *see Momentive*

*Performance Materials USA, Inc. v. AstroCosmos Metallurgical, Inc.*, 659 F. Supp. 2d 332, 345

(N.D.N.Y. 2009) (citing *Gianakakos v. Commodore Home Sys., Inc.,* 727 N.Y.S.2d 806, 808 (3d

Dep't 2001)), the proper date for the calculation of prejudgment interest is May 30, 2012, the

date on which McCaffrey wired $50,000 to buy Gatekeeper stock, (Pl. Ex. G, at 18).  The

applicable rate of interest is nine percent.  C.P.L.R. § 5004.[13]

McCaffrey will not be awarded punitive damages at this time.  "Under New York law,

the decision to award punitive damages and their amount are questions which primarily reside in

the jury's discretion."  *Racich v. Celotex Corp.*, 887 F.2d 393, 397 (2d Cir. 1989).  Given this,

and as explained in this Opinion & Order's conclusion section, *infra*, I will hold a conference to

---

[13] McCaffrey will also be awarded post-judgment interest, as such an award is "mandatory."  *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004) (citing 28 U.S.C. § 1961).  The rate of post-judgment interest shall be the rate provided by the governing statute.  *See* 28 U.S.C. § 1961.

discuss with the parties whether this action will proceed to trial solely on the issue of punitive damages.

McCaffrey's request for attorney's fees is DENIED.  "Plaintiff . . . is not an attorney and attorneys' fees are not awarded to non-attorney *pro se* plaintiffs."  *Granger v. Gill Abstract Corp.*, 566 F. Supp. 2d 323, 332 (S.D.N.Y. 2008) (collecting cases).  McCaffrey may, of course, receive his costs.  "Because Rule 54(d) allows costs as of course, such an award against the losing party is the normal rule obtaining in civil litigation, not an exception."  *Kenyon v. Weber*, Case # 16-CV-6510-FPG, 2019 WL 5064684, at *1 (W.D.N.Y. Oct. 9, 2019); *see also* 28 U.S.C. § 1920 (listing what "may [be] tax[ed] as costs" against a losing party and included in a judgment).  To do so, McCaffrey will have to submit a bill of costs in compliance with Local Civil Rule 54.1.  *See* Local Civil Rule 54.1.

Finally, McCaffrey's motion for summary judgment contains a request that I grant him sanctions due to Defendants' misconduct before the Court throughout this case.  (Doc. 252-2, at 7–8.)  The request for sanctions is DENIED without prejudice.  McCaffrey's request for sanctions is too general and too conclusory to allow me to make the requisite findings that Defendants engaged in sanctionable conduct.  *See generally In re Hornbeam Corp.*, 14-MC-424, 2022 WL 60313, at *4–5 (S.D.N.Y. Jan. 6, 2022) (discussing some of the bases for awarding sanctions).  Within 60 days of entry of this Opinion & Order, McCaffrey may make a motion for sanctions, but such a motion must be supported by briefing, specific citations to the instances of misconduct McCaffrey believes worthy of sanctions, and legal citations to support whatever amount of sanctions McCaffrey requests.[14]

---

[14] McCaffrey's prior requests for sanctions were based on "the amount [Individual Defendants]" purportedly "agreed to in settlement negotiations" before Magistrate Judge Robert W. Lehrburger.  (Doc. 252-2, at 8.)  This is not an appropriate request.  Judge Lehrburger's Individual Rules on Settlement Conference and Mediation Procedures

V.      **Conclusion**

For the foregoing reasons, Plaintiff's motion for summary judgment is GRANTED.  The

Clerk of Court is respectfully directed to terminate all open motions on the docket and to enter

judgment in favor of the Plaintiff against all Defendants, jointly and severally, in the amount of

$50,000, plus prejudgment interest at an annual rate of 9% starting from May 30, 2012, plus the

amount of Plaintiff's costs.

I will hold a conference in this action on May 3, 2022, at 4 p.m. to discuss whether this

action will proceed to trial solely on the issue of punitive damages.  This conference will be held

via telephone.  The dial-in for this conference is 888-363-4749, and the access code is 2682448.

The Clerk of Court is respectfully directed to mail copies of this Opinion & Order to

McCaffrey and to each of the Individual Defendants, as well as to email a copy of this Opinion

& Order to McCaffrey.

Once Seetoo receives a copy of this Opinion & Order, he is directed to email a copy to

Leontakianakos.

SO ORDERED.

Dated:  March 28, 2022
        New York, New York

_Vernon Broderick_

Vernon S. Broderick
United States District Judge

---

require parties to keep "[a]ll communications relating to settlement . . . strictly confidential" and forbids them from
being "used for any purpose other than settlement."  *See* Magistrate Judge Lehrburger's Settlement Conference and
Mediation Procedures ¶ 1,
https://nysd.uscourts.gov/sites/default/files/practice_documents/RWL%20Lehrburger%20Procedures%20for%20Set
tlement%20Conferences%202021.pdf.